Mitchell *v*. Chester Housing Authority,
Appellant.

Argued April 17, 1957. Before JONES, C. J., CHID-
SEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Vincent P. Desmond,* for appellant.

*Guy G. deFuria,* with him *J. Robert Twombly* and *deFuria, Larkin & deFuria,* for appellee.

*Thomas D. McBride,* Attorney General, with him *Joseph L. Donnelly,* Deputy Attorney General and *Charles H. Stone,* Legal Assistant, for Commonwealth, amicus curiae.

OPINION BY MR. JUSTICE CHIDSEY, June 6, 1957:

This is an action in assumpsit for breach of an employment contract brought by George S. Mitchell, Jr., the former Secretary-Executive Director of the defendant body, against the Chester Housing Authority, a corporation created pursuant to the Housing Authorities Law, Act of May 28, 1937, P. L. 955, 35 PS §1541 et seq.

The Housing Authority is composed of five members who serve without compensation for five-year terms, and in the case of Chester, a third class city, the Housing Authorities Law provides that two members of the Authority shall be appointed by the Mayor of the City and the other three members shall be appointed by the Governor, all for staggered terms so that the term of office of one member shall expire each year, Act of 1937, May 28, P. L. 955, §§5 & 6, 35 PS §§1545, 1546. Section 7 of the Housing Authorities Law, 35 PS §1547, provides inter alia: "The Authority may employ a secretary, such technical experts, and such other officers, agents, and employes, permanent or temporary, as it may require, and may determine the qualifications of such persons. . . . Any Authority may employ its own counsel and legal staff. . . . An Authority may delegate to one or more of its agents or employes such of its powers as it shall deem necessary to carry out the purposes of this act, subject always to the supervision and control of the Authority."

The by-laws of the Chester Housing Authority contain the following pertinent provisions in Article II, entitled Officers:

"Section 4—*Secretary.* The Secretary shall keep the records of the Authority, shall act as secretary of the meetings of the Authority and record all votes, and shall keep a record of the proceedings of the Authority in a journal of proceedings to be kept for such purpose, and shall perform all duties incident to his office. He shall keep in safe custody the seal of the Authority and shall have power to affix such seal to all contracts and instruments authorized to be executed by the Authority.

"The compensation of the Secretary shall be determined by the Authority, provided that a temporary appointee selected from among the members of the Authority shall serve without compensation, other than the payment of necessary expenses.

"The Secretary shall hold office for an indefinite term at the pleasure of the Authority. . . .

"Section 8—*Executive Director.* The Secretary shall be the Executive Director of the Authority and shall have general supervision over the administration of the business and affairs of the Authority, subject to the direction of the Authority. He shall be charged with the management of the housing projects of the Authority. The Executive Director shall countersign all checks issued by the Authority."

On June 4, 1939 the plaintiff was appointed by the Chester Housing Authority to act as Secretary and Executive Director, and served in that capacity on a month to month basis without written contract[1] until

---

[1] It appears that on April 7, 1943 a five-year contract of employment was executed between the parties, but that this contract was abrogated by the Housing Authority on December 3, 1943 when the membership of the Authority changed somewhat. On that date

November 18, 1954. On November 8, 1954, a new Governor of the Commonwealth, with power to appoint a majority of the members of the Housing Authority, was elected to take office the following January. Three days later, on November 11, 1954, a special committee, which had been appointed by the Chairman of the Authority the previous month to look into the matter, met with plaintiff in attendance as committee secretary and, by a vote of two to one, recommended to the Authority that it enter into contracts for a definite term of years with "key personnel", among them the plaintiff Secretary-Executive Director. The following week, on November 18, 1954, the Authority, by vote of four to one, adopted the recommendation of its special committee, and entered into a written contract with the plaintiff, engaging him as Secretary and Executive Director for a term of five years at a salary of $10,000 per year.

On March 19, 1955 two new members were appointed to the Housing Authority by the newly elected Governor to replace two whom he had removed from office. On March 28, 1955 the newly constituted board, by a vote of three to two, declared the November 18, 1954 contract to be null and void, and on May 18, 1955, by a similar vote,[2] it adopted a resolution that " '. . . the services of the Secretary, George S. Mitchell, Jr., be dispensed with, effective as of Friday, May 20, 1955.' ".

the Housing Authority by a resolution declared that plaintiff should be retained on a month to month basis only. Plaintiff raised no question about that action, and remained with the Authority on a monthly basis thereafter.

[2] On May 18, 1955 a third appointment to the Authority was made by the Governor, but since this appointee replaced the member of the former board who had voted against the contract, and who had voted with the majority on March 28, 1955 to declare the contract a nullity, the replacement was of no consequence in so far as this case is concerned.

Plaintiff thereupon instituted this action in assumpsit, which was tried without a jury, there being no significant facts in dispute. The trial court found for the plaintiff in the sum of $51,365.55 ($45,000 for the loss of salary for the four and a half years the contract was still to run and $6,365.55 which would have been the amount payable during that period by the defendant for plaintiff's retirement insurance policy), with interest. Exceptions were filed and argument had before the court en banc, which affirmed the trial judge's verdict and entered judgment thereon, from which this appeal is taken. The Attorney General filed a brief in this Court as amicus curiae, supporting the defendant Housing Authority's position.

The court below based its decision on its determination that the Chester Housing Authority should be governed by the rules relating to a business corporation, rather than those pertaining to a governmental agency, and that according to the principles governing business corporations the contract here was a valid and enforceable one. In this we believe the trial court erred. First, because there can be no question but that the Chester Housing Authority performs many functions which can only be regarded as governmental in scope, and as to those the ordinary business corporations rules are inapplicable. And second, because the nature of the employment in question is such that the public interest requires that this contract be deemed unenforceable.

Section 2 of the Housing Authorities Law, 35 PS §1542, after making the factual declaration that there exist in communities throughout the Commonwealth numerous slums, together with an acute shortage of safe and sanitary dwellings within the financial reach of persons of low income, that these conditions encourage the spread of disease, impair health and morals, increase the hazards of fires and accidents, subject the

moral standards of the people to bad influences, increase the violation of the criminal laws, and that because of the prevailing stagnation of business activity, private industry is unable to cope with this situation, states: "Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to promote the health and welfare of the inhabitants thereof by the creation of corporate and politic bodies to be known as housing authorities. The public purposes for which such authorities shall operate shall be—(1) the clearance, replanning, and reconstruction of the areas in which slums exist; (2) the providing of safe and sanitary dwelling accommodations for persons of low income, so as to prevent recurrence of the economically and socially disastrous conditions hereinbefore described; and (3) the accomplishment of a combination of the foregoing. Such purposes are hereby declared to be public uses for which public money may be spent, and private property acquired by the exercise of the power of eminent domain."

Section 10, 35 PS §1550, states: "An Authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof, . . .".

In *Dornan v. Philadelphia Housing Authority et al.,* 331 Pa. 209, 200 A. 834, which determined the constitutionality of the Housing Authorities Law, Mr. Justice (later Chief Justice) STERN, in discussing the concept of "public use" as it applied to them, made the following pertinent observations about the nature of Housing Authorities, at page 222: ". . . Furthermore, a stronger presumption arises in favor of the public nature of the use where the taking is by the government itself instead of by a private corporation endowed with the right of eminent domain. While the Housing Authorities are not part of the Government, they are

public bodies created and organized solely to promote the general welfare and without any motive or possibility of private profit accruing to anyone, since the rentals are to be fixed at rates no higher than necessary to pay principal and interest on the Authority's bonds and its operating costs and administrative expenses.

"In addition to all that has heretofore been said, there is, in the legal situation here presented, a factor which conclusively determines that the use for which these housing projects are designed is a public one, namely, that the construction of the new dwellings as authorized by these statutes is to be an aid to, and indeed a necessary adjunct of, the demolition of dangerous and unsanitary dwellings, which, in turn, is an exercise of the police power of the Commonwealth. . . .".

It would seem beyond question that a "public body . . . exercising public powers of the Commonwealth", and especially an agency which exercises "police" powers, would not be subject in all respects to the rules which relate generally to business corporations. We have held that when a Housing Authority operates a refuse dump it will be subject to tort liability just as would a private business corporation, *Hill v. Allentown Housing Authority,* 373 Pa. 92, 95 A. 2d 519, and no doubt a contract let for the purchase of materials and supplies, or a contract of employment in connection with a special project, would ordinarily be enforceable as are other business contracts, but when a contract relating inseparably to the overall functioning of a public body is in question, very different considerations present themselves. The issue before us is whether an employment contract with one charged with the supervision and management of the affairs of a "public body . . . exercising public powers of the Commonwealth" is enforceable when its duration extends beyond the

term of office of those who appointed him. Stated differently, the issue may be put: May the members of the board of a Housing Authority bind successor boards differently constituted to the employment of an executive officer whose functions with respect to the board are necessarily confidential and most intimate, when such executive officer may be wholly unacceptable to a successor board?

In so far as the Housing Authority exercises the police powers of the Commonwealth in connection with a large part of its operation, it is undoubtedly an agency performing governmental functions in such regard, and in that capacity it could not bind its successors. As stated in *Commonwealth ex rel. Fortney v. Bartol et al.*, 342 Pa. 172, 175, 20 A. 2d 313, ". . . In the performance of sovereign or governmental, as distinguished from business or proprietary, functions, no legislative body, or municipal board having legislative authority, can take action which will bind its successors: McCormick v. Hanover Township, 246 Pa. 169, 92 A. 195; Moore v. Luzerne County, 262 Pa. 216, 105 A. 94; Born v. Pittsburgh, 266 Pa. 128, 109 A. 614. It cannot enter into a contract which will extend beyond the term for which the members of the body were elected. . . .".

While it may be conceded that the Housing Authority is not a "legislative body, or municipal board having legislative authority", the applicable principle would certainly apply to agencies acting in lieu of such a body, exercising some of the powers ordinarily exercised by it, and acting by virtue of its express mandate.

How does this principle affect the contract of employment under consideration here? There is no doubt that this contract purported to, and indeed the circumstances of its execution compel the conclusion that its

very intent was to bind the successors of the membership of the Authority which executed the agreement. If each member of the Authority completed the term of office assigned to him, a new appointment (or a reappointment) would have been made to the Authority each year and before the end of the five years the contract was to have run, *every* term of office of the members of the then extant Authority would have expired. Furthermore, the newly elected Governor had the authority to remove a *majority* of the members *at his pleasure, Commonwealth ex rel. Reinhardt v. Randall,* 356 Pa. 302, 51 A. 2d 751, and appoint a wholly different majority. Plaintiff occupied the same office for fifteen years without a long-term contract, and no substantial reason or necessity was advanced or appears for a new arrangement. The fact that this contract was executed by a majority of one political make-up within a few days after it became certain that a Governor of a different political hue would soon take office, can hardly be viewed as a mere coincidence. But conceding that political considerations may have been present in both the execution of the contract in question and the subsequent abrogation thereof, nevertheless the situation here presented must be considered in light of the broad and overriding principle that subordinates in public agencies should be directly responsive to the policies of public officials duly elected by the voters of the Commonwealth.

Does the contract in question relate to the "governmental" functions of the Housing Authority? An examination of the record before us makes abundantly clear that it does. The testimony at trial describes the the Secretary-Executive Director as the "chief officer" and the "right arm" of the Chester Housing Authority. The contract executed on November 18, 1954 states:

"2. The duties and authority of the said George S. Mitchell, Jr., as Secretary and Executive Director of the Chester Housing Authority, shall be as follows:

"He shall keep the records of the Authority; shall act as Secretary of the meetings of the Authority; and shall record all votes taken at such meetings, and keep a permanent record thereof. He shall keep a record of the proceedings of the Authority in a Journal to be kept for such purpose, and shall perform all the duties incident to his office. He shall keep in safe custody the seal of the Authority; shall have the power to affix such seal to all contracts and instruments authorized to be executed by the Authority.

"He shall be the Executive Director of the Authority and shall have general supervision and direction of the operation and management of the business of the Chester Housing Authority, subject to the direction of the Authority. He shall sign all checks, together with the Chairman and Treasurer, drawn on the funds of the Authority. He shall recommend to the Housing Authority which employees shall be hired, retained, or dismissed for cause. He shall supervise the work of the employees of the Authority and shall have the sole and exclusive power, subject to the control of the Authority, to hire and discharge any and all of the employees. He shall put into effect all policies of the Authority in respect to any new planning or building and in respect to the managing of the housing units. He shall be responsible for the relations of the Authority with other public and private agencies, and where required, to prepare such reports for the Authority on the general operations of its staff, and on such other specific matters concerning which the Authority inquires. He shall make recommendations to the Authority as to the general development and operations of its program, and perform such special duties as may

be assigned to him by the Authority from time to time."[3] Read in connection with the Authority's by-laws, pertinent provisions of which are recited earlier in this opinion, and in view of the fact that the regular meetings of the Authority took place only once a month "on the second Tuesday of each month at 7:30 o'clock p.m.", and that the members of the Authority served without compensation, there can be little doubt but that the effective exercise of the functions of the Chester Housing Authority, whether in their proprietary or governmental capacities, was through its Secretary-Executive Director. He was present at every meeting, he made recommendations to them as to the development of their programs, he put into effect their policies, supervised all of the employes of the Authority and directed the operation and management of its business. His relationship to the Authority was so close and so confidential that it may be said that, for most purposes, he was in fact the Chester Housing Authority in action. And in so far as the Authority acted in a governmental capacity, it acted generally at the suggestion of, and of necessity through its Secretary and Executive-Director. It is, of course, true that it acted through him in its business capacity too, but that does not take this contract out of the operation of the rule. The obvious purpose of the rule is to permit a newly appointed governmental body to function freely on behalf of the public and in response to the governmental power or body politic by which it was appointed or elected, unhampered by the policies of the predecessors who have since been replaced by the appointing or electing power. To permit the outgoing

---

[3] An almost identical listing of duties and authority appeared in the contract of April 7, 1943, so it may be concluded that the conception of the Secretary-Executive Director's functions over the years has remained largely unchanged.

body to "hamstring" its successors by imposing upon them a policy-implementing and, to some extent, policy-making machinery, which is not attuned to the new body or its policies, would be to most effectively circumvent the rule.

In *McCormick v. Hanover Township*, 246 Pa. 169, 92 A. 195, a contract between the supervisors of a township and an attorney whose legal services were to be rendered to the township when a different board of supervisors would be in office was held invalid. Mr. Justice STEWART stated, page 172: ". . . Was the contract made with the plaintiff within the scope of the powers of the supervisors? We are of opinion that it was not, for the following reasons: First, because the contemplated employment of the plaintiff was for a term to begin after a new fiscal year had been entered upon during which, except for the unusual conditions here existing, a board otherwise constituted than this would have been in office; and second, because the contract was so extravagantly improvident in view of the circumstances disclosed, that it is to be condemned as an unwarranted exercise of power . . . In engaging counsel supervisors are acting as the agents of the township, and are exercising a governmental as distinguished from a proprietary or business function, a distinction to which we shall refer later. That the contract in the present case was for services to be rendered during an entire year does not in itself therefore expose it to adverse criticism; but, associated with this is another feature which is of fatal significance. The contract was entered into, 15th December, 1910. The year's service was to begin the first Monday of March, 1911, when the new fiscal year next ensuing was to begin. Under usual and ordinary conditions a board of supervisors changes with each fiscal year by the expiration of the term of service of one supervisor, to whose place

a newly elected supervisor succeeds. Therefore the contract with the plaintiff was for the services to be rendered under a succeeding administration which was thereby denied the right of choosing its own legal assistants. That this was in excess of the power of the contracting board is established by abundant authority. . . .", citing and discussing supporting cases.

And similarly in *Moore v. Luzerne County,* 262 Pa. 216, 105 A. 94, a contract between a civil engineer and the county commissioners, executed shortly before they were to leave office, was held invalid, the Court saying, at page 220: ". . . The contract was made by the county commissioners but a few days preceding their retirement from office and the induction of their successors, and related to work, all of which was to be performed after they had ceased to be public officials. As the record now is, it is barren of any explanation of that material fact. It is a mistake to suppose that, because a public official, or indeed any other agent for a known limited term, has power to make a contract, he is authorized thereby to make one for an indefinite or long extended term. If the agency itself does not expressly limit the extent of the agent's power, then the facts and circumstances of each case must be considered in determining it. Ordinarily it is limited in time to the term of the agent who makes it. Necessity, or its equivalent of great advantage to the principal, may furnish a reason for enlargement beyond the term, but he who asserts the existence of the necessity of great benefit has the burden of proving it. This is particularly true of public officials, else those going out of office might so tie the hands of those coming in as to cause serious embarrassment and loss to the public. . . .".

The policy of making an appointee responsible directly (with certain exceptions) to the power by whom

he was appointed, is a principle of good administration and good government, and is applied to organs of this Commonwealth by Section 4, Article VI of our Constitution. Members of the Housing Authority have been held to be freely removable ". . . at the pleasure of the power by which they shall have been appointed" in *Commonwealth ex rel. Reinhardt v. Randall,* supra. It would be wholly illogical to hold the members of the Authority itself to be freely removable by the appointing power and not to hold the person most directly involved in carrying out the general functions of the Authority to be subject to the same control.

In *Commonwealth ex rel. Schofield v. Lindsay,* 330 Pa. 120, 198 A. 635, we considered the power of the council of the City of Pittsburgh to remove the City Clerk which it had appointed for a three-year term. What Mr. Justice (later Chief Justice) MAXEY said at page 123 is equally, if not more apposite here: "Article VI, section 4, of the Constitution is an expression of a governmental principle which is supported both by reason and authority. It is a tenet of good government that except in those cases where the public welfare requires that an official charged with important governmental functions should be protected against interference on the part of the executive and in those cases where special classes of public servants, such as policemen and firemen, are placed under civil service protection, the power of removal is correlative with the power of appointment. The liability to summary removal attaches with manifest appropriateness to those subordinates who occupy close confidential relations with their superiors in the public service. The relation of a city clerk to the city council is almost as close and confidential as that of a private secretary to his chief. The city clerk is present at the meetings of the council; he hears the council's discussions; he makes

official entries of all proceedings, votes, orders, resolutions and ordinances; his records are received as the best evidence of the official acts of the council, and he is the custodian of all their journals, books and papers. To hold that city council must retain in this confidential position a clerk who for any reason is unacceptable to it would result in a disturbed municipal situation inconsistent with the efficient administration of civic affairs. . . .".

In the instant case, the Secretary-Executive Director performs not only the functions ascribed to the City Clerk in the above case, but his relationship is even closer and more confidential in that he performs extensive managerial and supervisory functions, and the reason for holding the City Clerk removable would be even more compelling here.

The principle of the foregoing cases is clear, namely, good administration requires that the personnel in charge of implementing the policies of an agency be responsible to, and responsive to those charged with the policy-making function, who in turn are responsible to a higher governmental authority, or to the public itself, whichever selected them. This chain of responsibility is the basic check on government possessed by the public at large. A contract which will have the effect of, and indeed appears to have been executed with the express purpose of, violating this rule runs counter to public policy and will not be enforced against the public interest. We therefore hold that the contract here involved is unenforceable, and the judgment entered below must be reversed.

In view of this disposition of the case, it is unnecessary to consider any of the questions presented to us pertaining to the measure of damages.

Judgment reversed and here entered for the defendant.