499 Pa. 194 (1982)
452 A.2d 1005
FRATERNAL ORDER OF POLICE, E.B. JERMYN LODGE # 2, by Thomas P. TOLAN, Jr., President, Trustee ad Litem, Appellant,
v.
Eugene F. HICKEY, Mayor of the City of Scranton; James McDonnell, Director of Public Safety; Richard Rossi, Jack T. Harte, James A. Doherty, Michael Melnick, Paul Catalano, Councilmen of the City of Scranton; Joseph Corcoran, Controller of the City of Scranton; Eugene Cosgrove, Treasurer of the City of Scranton; and the City of Scranton, Pennsylvania.
Supreme Court of Pennsylvania.
Argued April 19, 1982.
Decided December 7, 1982.
*195 Anthony P. Moses, Wilkes Barre, for appellant.
John J. Brazil, Ralph J. Iori, Jr., Asst. City Sols., for appellee.
*196 Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

OPINION
NIX, Justice.
In this appeal, the underlying facts and the chronology of events are not in dispute. The legal question raised for our consideration is whether a provision in the collective bargaining agreement between the City of Scranton (City) and the members of its Police Department is enforceable. We hold that this provision, that was voluntarily agreed to by the City during the bargaining process, cannot now be objected to by the City or its officials on the basis of its alleged illegality.
The clause in controversy was agreed upon on January 1, 1973, as part of a two-year agreement between the City and the members of its police force. The clause in controversy reads as follows:
That, the Chief of Police, and in the event the City shall employ a Commissioner of Police, or Superintendent of Police or some other similar plan, the person who fills the position must come from the ranks of the Scranton Police Department.
This clause together with the rest of the agreement was approved by the City Council and was continued in effect through calendar years 1975-76, 1977 and 1978, as part of the collective bargaining agreement and subsequent binding arbitration awards between the parties. From the clause's adoption in 1973 until 1978, its legality was not challenged. In 1978, a newly elected mayor appointed an individual in the position of Superintendent of Police for the City of Scranton who, although well qualified for the position, did not come from the ranks of the Scranton Police Department. The collective bargaining representative for the city's police officers, the Fraternal Order of Police (F.O.P.) instituted an action in mandamus requesting the removal of the mayor's appointee and the appointment of a person in accordance *197 with the clause in question. Subsequent to the filing of an answer, the F.O.P. filed a motion for preemptory judgment. After hearing upon the motion, the trial court issued an order dismissing the mandamus action. That action was affirmed by the Commonwealth Court.
The trial court and the Commonwealth Court focused upon whether the subject matter of the contract clause was a suitable subject for collective bargaining under the Act of June 24, 1968, P.L. 237, § 111, § 1 et seq. 43 § 217.1 et seq (Supp. 1981-82) (Act 111). The more pertinent question is whether the city or one of its officials should be allowed to raise the question at this late date.
In Pittsburgh Joint Collective Bargaining Committee v. City of Pittsburgh et al, 481 Pa. 66, 391 A.2d 1318 (1978), we held that the City of Pittsburgh could not assert the defense that a grievance arbitration procedure to which it had agreed in the bargaining process was in conflict with various provisions of the Civil Service Act, 53 P.S. § 23401 et seq. (1957 & Supp. 1978-79), such that the implementation of the procedure was prohibited by section 703 of the Public Employee Relations Act of 1970, (PERA) 43 P.S. § 1101.703 (Supp. 1978-79). In reaching this conclusion, we observed that the collective bargaining process was applied to the public sector on the premise that it would further harmonious relationships between the public employer and the employe and thereby result into a more effective and efficient operation for the taxpayer. However, to carry out that objective it was imperative that the integrity of the collective bargaining process not be undermined. In Pittsburgh, supra, we reflected that commitment to the integrity of the process by refusing to permit a city to challenge the validity of a grievance arbitration it had agreed to follow.
So too, in Ambridge Borough Water Authority v. Columbia, 458 Pa. 546, 328 A.2d 498 (1974), we refused to permit a governmental unit employer from asserting its own incapacity in an attempt to avoid arbitration, noting:
". . . [t]here is no question that there was a mutual agreement to arbitrate future disputes. Equally as clear *198 is that there is no challenge to the capacity of the Authority to enter into an agreement providing for arbitration. Furthermore, the parties operated under this agreement for a period of three and one-half years. In this posture the lower court properly refused to reach the merits of [governmental unit employer's] claim of lack of capacity." Id. 458 Pa. at 551, 328 A.2d at 501.
The fact that the instant dispute does not constitute a refusal by a governmental unit to participation in an arbitration procedure it had agreed to does not provide a basis for distinction. To permit a public employer to secure an advantage in the bargaining process by agreeing to a term and subsequently avoid compliance by belatedly asserting that term's illegality is equally inimical to the integrity of the bargaining process and undermines the harmonious relationship it was designed to foster. As noted in Pittsburgh, supra:
"To permit an employer to enter into agreements and include terms . . . which raise the expectations of those concerned, and then to subsequently refuse to abide by those provisions on the basis of its lack of capacity [or the asserted illegality of the term] would invite discord and distrust and create an atmosphere wherein a harmonious relationship would virtually be impossible to maintain." Id. 481 Pa. at 74, 391 A.2d at 1322.
See also West Middlesex Area School District v. Pennsylvania Labor Relations Board et al, 55 Pa.Cmwlth Ct. 404, 423 A.2d 781 (1980).
It has also been previously recognized that this principle is equally applicable to the integrity of the collective bargaining process under Act 111. Grottenthaler v. Pennsylvania State Police, 488 Pa. 19, 410 A.2d 806 (1980). In Grottenthaler, quoting from Pittsburgh, supra 481 Pa. at 75. 391 A.2d 1322-23, we emphasized:
"Good faith bargaining would require that questions as to the legality of the proposed terms of a collective bargaining agreement should be resolved by the parties to the agreement at the bargaining stage."

*199 Id. 488 Pa. at 25, 410 A.2d at 809.
Act 111 specifically recognized the need for good faith bargaining as essential to the objectives it sought to obtain.
"It shall be the duty of public employers and their policemen and firemen employes to exert every reasonable effort to settle all disputes by engaging in collective bargaining in good faith. . ."
43 P.S. § 217.2 (Supp. 1981-82) (Emphasis added)
Obviously the statutorily mandated obligation to bargain in good faith is not met by permitting the governmental employer to avoid the performance of a term by questioning its legality after having received the advantages that flowed from the term's acceptance.
The Commonwealth Court referred to the well recognized rule that arbitrators may not mandate that a governing body carry out an illegal act. Grottenthaler v. Pennsylvania State Police, supra; Washington Arbitration Case 436 Pa. 168, 259 A.2d 437 (1969). However, as recognized in Grottenthaler, supra, a distinction must be drawn between situations where an arbitration panel attempts to mandate a governing body, over its objection, to carry out an illegal act and situations where the governmental unit employer attempts to belatedly avoid compliance with a term of a bargaining agreement it voluntarily agreed to during the bargaining process and thereby secure an unfair advantage in the bargaining process. See also Pittsburgh Joint Collective Bargaining Committee v. City of Pittsburgh, supra. Here, the clause in controversy was mutually agreed upon by the parties to the bargaining agreement in January of 1973 to cover a two year period. This clause, together with the remaining provisions of the agreement was presented to and approved by City Council. The legality of the provision was not raised during that stage. Thereafter the provision was continued in effect through calendar years 1975-76, 1977 and 1978, as part of the collective bargaining agreement and subsequent binding arbitration awards between the parties. Until the instant complaint was raised, the legality of the provision was not questioned. For the year *200 1973, wherein the contested provision was first agreed upon, the police officers accepted a contract which did not provide for any increase in wages.[1] It would be difficult to envision a more appropriate case for imposing this concept of estoppel.
Finally, we are satisfied that the application of the theory of estoppel to the instant facts does not conflict with the principle that one administration will not be permitted to bind its successor in the exercise of its discretion to make and effectuate policy. See e.g. Mitchell v. Chester Housing Authority, 389 Pa. 314, 132 A.2d 873 (1956). That principle is directed to the bad faith effort on the part of an outgoing administration to attempt to handcuff their successor. The instant facts are clearly distinguishable. The term in question was agreed upon long before the newly elected mayor's administration was contemplated. Moreover, we are not here faced with the selection of an individual by a preceding administration, but rather a designation of the class from which that individual is to be selected. It is to be noted, there is nothing in this record that would suggest that the new administration could not obtain from this class an appointee of the competence it sought and possessing the political philosophy it desired. It also must be remembered that the provision was only binding for the year of 1978, which would have permitted the newly-elected mayor, who was entering a four-year term, to delay the selection of a new chief until the expiration of that contract. At the end of that contract period, the new administration was obviously free to decline to agree to this or any other provision it determined to be in conflict with its policy. Thus, through the bargaining process, the withdrawal of this term would be accommodated by some other concession by the governmental unit employer which would produce an agreement where each party is provided an equal opportunity to fashion *201 an agreement in their best interest.[2]
Accordingly, the Order of the Commonwealth Court is reversed and the complaint reinstated.
McDERMOTT, J., concurs in the result.
ROBERTS, J., files a dissenting opinion joined by FLAHERTY and HUTCHINSON, JJ.
ROBERTS, Justice, dissenting.
I dissent. Even assuming that the 1977 arbitration award directing the retention in 1978 of "[a]ll existing benefits and privileges not specifically changed" incorporates by reference the provision of the 1973-74 bargaining agreement which states that the Superintendent of Police "must come from the ranks of the Scranton Police Department," that provision cannot validly be enforced against appellee Mayor Eugene F. Hickey who, having assumed office in 1978, was a party to neither the 1973-74 bargaining agreement nor the 1977 arbitration proceedings.[1]
The plurality's theory of estoppel, based on the preceding administration's agreement to select a Superintendent of Police from the ranks of the Scranton police force, has no bearing on appellant's right to compel the administration of appellee Mayor Hickey to engage in the same selection procedure. Hickey at no time agreed to select a Superintendent of Police by the same method used by the former mayor, Eugene J. Peters, but rather asserted his executive authority to exercise "full charge and control of all executive departments in the city." Scranton Home Rule Charter, 335 Pa.Code § 11.6-609(2) (effective January 5, 1976). This authority of course includes the power to select a chief *202 of police unrestricted by the limitation that the chief be selected from the force.
It is a fundamental principle of constitutional government that one administration cannot bind its successor in the exercise of its discretion to select policy-making employees. Mitchell v. Chester Housing Authority, 389 Pa. 314, 132 A.2d 873 (1957). See generally Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); Branchick v. Commonwealth, Department of Labor and Industry, 496 Pa. 280, 436 A.2d 1182 (1981). In Mitchell v. Chester Housing Authority, supra, which held that the board of a municipal authority cannot lawfully bind successor boards to the employment of an executive officer, this Court stated:
"[G]ood administration requires that the personnel in charge of implementing the policies of an agency be responsible to, and responsive to those charged with the policy-making function, who in turn are responsible to a higher governmental authority, or to the public itself, whichever selected them. This chain of responsibility is the basic check on government possessed by the public at large. A contract which will have the effect of, and indeed appears to have been executed with the express purpose of, violating this rule runs counter to public policy and will not be enforced against the public interest."
389 Pa. at 328, 132 A.2d at 880. See also Scott v. Philadelphia Parking Authority, 402 Pa. 151, 166 A.2d 278 (1960).[2]
Even on the unreasonable assumption that one mayor could, for appropriate consideration, legitimately bind his successor in the exercise of his executive discretion to select policy-making employees, appellant has no cause for complaint. Appellant claims that it agreed to a pay freeze for the 1973 year as consideration for the concession from former mayor Eugene Peters with regard to the selection of *203 the chief of police.[3] In fact, as appellant acknowledges, the 1973-74 agreement between appellant and Mayor Peters was performed according to its terms: the chief of police was selected from within the ranks of the Scranton Police Department. From 1975 through 1977, the remaining years of the Peters administration, contracts between appellant and the City of Scranton were reached through arbitration awards, not by collective bargaining. In each of those years the police of Scranton were granted a pay raise, and throughout the period Mayor Peters, in his discretion, continued to accord the police the "benefit" of a chief selected from within their ranks. Surely, having received the benefit of its 1973-74 bargain through 1977 in addition to subsequent pay raises, appellant cannot reasonably claim that a new mayor assuming office in 1978 is legally bound by appellant's forgoing of a pay raise in 1973 or by the previous administration's gratuitous acquiescence from 1975 to 1977 in a contract term for which it did not bargain.
Thus, on this record, it is clear that the theory of estoppel is inapposite. It is also clear that the court of common pleas did not abuse its discretion in concluding that appellant Fraternal Order of Police failed to establish a clear legal right to the relief sought and the existence of a corresponding duty on the part of the mayor to act, essential requirements for the issuance of the extraordinary writ of mandamus. See, e.g., Coleman v. Board of Education of School District of Philadelphia, 477 Pa. 414, 383 A.2d 1275 (1978).
*204 Accordingly, the order of the Commonwealth Court affirming the order of the Court of Common Pleas of Lackawanna County should be affirmed.
FLAHERTY and HUTCHINSON, JJ., join this dissenting opinion.
NOTES
[1] It is reasonable to conclude that in the contracts following the 1973 agreement other considerations were received for the continuation of this term of the contract.
[2] It is of interest that the newly-elected mayor in 1978 has since left office and that his successor has in fact selected a chief of police in conformity with the terms of the contract provision.
[1] The four-year term of office of appellee Hickey, who is no longer the mayor of Scranton, expired at the beginning of 1982.
[2] In denying appellant's claim, the Court of Common Pleas of Lackawanna County observed: "Each administration comes into office with new ideas and designs on how to best run the city. To impede these innovations by a requirement that an executive and managerial head must come from the pre-selected `old guard' would, we think, be a step backward in confronting the ills of today's urban cities."
[3] It is doubtful that Mayor Peters "conceded" anything in this regard. In 1973, the mayor was governed by the Third Class City Code, which provides:

"The mayor shall designate, from the force, the chief and other officers who shall serve as such officers until their successors are appointed and qualified. The chief of police shall be designated by the mayor and may be demoted without cause in the same manner, but not to any rank lower than the rank which he held at the time of his designation as chief of police."
Act of June 28, 1951, P.L. 662, § 20, as amended, Act of December 27, 1967, P.L. 893, § 2, 53 P.S. § 37002 (Supp. 1982-83). In 1976, the City of Scranton adopted a home rule charter granting broader power to the mayor than existed under the Third Class City Code.