**BOROUGH OF PITCAIRN**

v.

**Ben WESTWOOD, III, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 2004.
Decided March 29, 2004.
Reargument En Banc Denied
May 26, 2004.

 

Paul D. Boas, Pittsburgh, for appellant.

Craig H. Alexander, Pittsburgh, for appellee.

BEFORE: COLINS, President Judge, SIMPSON, J. (P.), and McCLOSKEY, Senior Judge.

OPINION BY Judge SIMPSON.

In this first-impression appeal by a displaced police chief, we consider the effect of full compliance with the statutory civil service process on his appointment by a borough council majority about to leave office. We affirm the conclusion of the Court of Common Pleas of Allegheny County (trial court) that the outgoing council majority improperly sought to bind the successor council to the appointment of the police chief.

As the undisputed sequence of events is important, we detail it here. In August 2001, the chief of police of the Borough of Pitcairn (Borough) announced he would retire the next month. The Borough promptly advertised the position and began accepting applications.

Ben Westwood, III, submitted his application in late August 2001. He, and four others, were interviewed by Borough council on October 27, 2001.

Shortly thereafter, on November 6, 2001, a general election was held. Four members of the seven-member Borough council were not re-elected.

On November 21, 2001, Westwood was nominated by Borough council as police chief. The nomination was forwarded to the Borough's civil service commission. Shortly thereafter, Westwood appeared before the civil service commission and took the non-competitive civil service examination. He was certified by the civil service commission, which strongly recom-

mended his approval for the position of chief of police. The overall process complied with the statutory non-competitive civil service appointment provision for borough police chiefs.

On December 12, 2001, Borough council voted 4–2, with one abstaining, for Westwood's appointment as police chief. The four affirmative votes came from the Borough council members who had been defeated in the November election. Westwood began his duties on January 2, 2002.

After assuming their positions as Borough council members on January 7, 2002, the four newly-elected members together with those remaining from the prior council removed the Borough solicitor and hired a new one. The new solicitor immediately produced a memorandum opining that it was "patently clear that Mr. Westwood's appointment is void as against public policy." On the same day, acting on the opinion of the new solicitor, Borough council terminated Westwood as chief of police. It is undisputed that the abrupt end of Westwood's brief tenure as police chief was not consistent with civil service protection.

Immediately thereafter, Westwood filed an appeal with the civil service commission. The civil service commission took no action. Accordingly, Westwood brought a declaratory judgment action in the trial court.

Aided by well-reasoned argument on cross-motions for summary judgment, the trial court declared Westwood's appointment void as a governmental appointment made by the outgoing council contrary to *Lobolito, Inc. v. N. Pocono Sch. Dist.*, 562 Pa. 380, 755 A.2d 1287 (2000) and *Falls Township v. McManamon*, 113 Pa.

Cmwlth. 504, 537 A.2d 946 (1988). This timely appeal by Westwood followed.

■ Motions for summary judgment are appropriate under the Declaratory Judgments Act.[1] *See* 42 Pa.C.S. § 7533; *J.R.W., Inc. v. Manchester Borough Council*, 148 Pa.Cmwlth. 238, 610 A.2d 1078 (1992). Our review of the trial court's order granting summary judgment is limited to deciding whether the court committed an error of law or abused its discretion. *Mountain Vill. v. Bd. of Supervisors of Longswamp Township*, 828 A.2d 411 (Pa.Cmwlth.2003). Summary judgment is appropriate when, after review of the record in the light most favorable to the non-moving party, it is determined that no genuine issue of material fact exists and the moving party is entitled to summary judgment as a matter of law. *Id.*

Westwood contends that because his appointment conformed to statutory civil service procedures, civil service protection should attach. The Borough contends the appointment was void as against public policy, thereby precluding the attachment of civil service protection.

## I. Civil Service Protection

Prior to 1941, police employed by boroughs had no civil service or job tenure rights and were subject to peremptory removal by borough council. *George v. Moore*, 394 Pa. 419, 147 A.2d 148 (1959). What is commonly called the Police Civil Service Act changed this for boroughs employing three or more police officers.[2] By the Police Civil Service Act, police employed by boroughs were granted job tenure rights which prohibited their dismissal, except for causes stated in the statute and

1. 42 Pa.C.S. §§ 7531–7541.

2. Act of June 5, 1941, P.L. 84, *as amended*, 53 P.S. § 53251–53277, repealed as to boroughs by The Borough Code, Act of July 10, 1947, P.L. 1621.

in compliance with the procedures outlined therein. Section 20, 21 of the Police Civil Service Act; 53 P.S. §§ 53270, 53271.

All the provisions of the Police Civil Service Act were repealed and reenacted as part of The Borough Code.[3] The reenactment still applied only to boroughs having police forces of three or more members. Sections 1165 and 1185 of The Borough Code. In 1951, the legislature passed what is commonly called the Police Tenure Act,[4] which extended civil service protection to police forces of less than three members. These provisions were reenacted as part of The Borough Code now in effect.[5]

In *Appeal of Gagliardi*, 401 Pa. 141, 145–46, 163 A.2d 418, 420 (1960), our Supreme Court held that the purpose of civil service protection in subdivision (j) of the Borough Code then in effect was "to insure the continuance in office of those individuals who are faithful and conscientious in the discharge of their duties and to free these public officers from the fear of political and personal prejudicial reprisal." The Supreme Court concluded that civil service protection was not intended to restrict boroughs from prescribing reasonable and non-discriminatory qualifications for those favored by appointment. It therefore upheld a residency requirement for borough police officers.

In *Manning v. Civil Serv. Comm'n*, 387 Pa. 176, 127 A.2d 599 (1956), the Supreme Court considered the dismissal of a borough police chief in the context of the civil service protection of the Borough Code then in effect. The Supreme Court concluded that the individual lacked the statutory prerequisites for appointment as a police officer. "Inasmuch as he was never validly employed under the Borough Code as a patrolman, he is not entitled to the protection of its provisions regarding a hearing." *Id.* at 181, 127 A.2d at 601. The Court concluded: "An employment which in its inception violates [the Borough Code] is illegal and against public policy . . . ." *Id.* Under these circumstances, the police chief, who served for three years, was effectively removed by the Supreme Court.

■ Considering the foregoing, we conclude that the purpose of civil service protection for borough police officers is to protect those officers from the fear of political and personal prejudicial reprisal and to favor the borough with their continuance of faithful and conscientious performance. *See Gagliardi.* However where the employment was illegal and contrary to public policy at its inception, civil service protection does not attach. *Manning.* Further, no expectation for continuation in office arises under those circumstances. *Id.*

## II. Prohibition Against Binding Successor Bodies

With respect to agreements involving governmental functions of municipal or legislative bodies, our appellate courts repeatedly hold that governing bodies cannot bind their successors. *See, e.g., Fraternal Order of Police v. Hickey*, 499 Pa. 194, 452 A.2d 1005 (1982); *Scott v. Phila. Parking*

---

3. Act of July 10, 1947, P.L. 1621. Section 39 of The Borough Code revised and amended the Act of May 4, 1927, P.L. 519, to add subdivision (j) and Sections 1165 to 1190 to Article XI of that Act.

4. Act of June 15, 1951, P.L. 586, *as amended*, 53 P.S. §§ 811–816.

5. Act of February 1, 1966, P.L. (1965) 1656, *as amended*, 53 P.S. §§ 45101–48501. Subdivision (j) of The Borough Code, titled Civil Service for Police and Firemen, is found at 53 P.S. §§ 46171–46195.

*Auth.,* 402 Pa. 151, 166 A.2d 278 (1960); *Mitchell v. Chester Hous. Auth.,* 389 Pa. 314, 132 A.2d 873 (1957); *Born v. City of Pittsburgh,* 266 Pa. 128, 109 A. 614 (1920); *Moore v. Luzerne County,* 262 Pa. 216, 105 A. 94 (1918); *McCormick v. Hanover Township,* 246 Pa. 169, 92 A. 195 (1914); *State Street Bank & Trust Co. v. Commonwealth Treasury Dep't,* 712 A.2d 811 (Pa. Cmwlth.1998); *Falls Township.* Clearly, this authority predates the police civil services acts.

The most recent pronouncement appears in *Lobolito,* in which our Supreme Court determined whether an agreement to build a new school, entered into by a school board at the expiration of its term, bound the successor school board. Discussing the distinction between governmental functions and proprietary or business type functions, the Court noted (with emphasis added):

> In the performance of sovereign or governmental, as distinguished from business or proprietary, functions, *no legislative body, or municipal board having legislative authority, can take action which will bind its successors.* It cannot enter into a contract which will extend beyond the term for which the members of the body were elected.

562 Pa. at 385, 755 A.2d at 1289 (quoting *Commonwealth ex rel. Fortney for Use of Volunteer Fire Dep't v. Bartol,* 342 Pa. 172, 175, 20 A.2d 313, 314 (1941)) (citations omitted). The Court went on to explain the reason for this policy:

> The obvious purpose of the rule is to permit a newly appointed governmental body to function freely on behalf of the public and in response to the governmental power or body politic by which it was appointed or elected, unhampered by the policies of the predecessors who have since been replaced by the appointing or electing power. To permit the

outgoing body to 'hamstring' its successors by imposing upon them a policyimplementing [sic] and to some extent, policymaking [sic] machinery, which is not attuned to the new body or its policies, would be to most effectively circumvent the rule.

*Id.* at 385, 755 A.2d at 1289–90 (quoting *Mitchell,* 389 Pa. at 324, 132 A.2d at 878). In noting a lone exception to this rule, the Court identified considerations "of urgency and necessity, especially when coupled with the stipulated public interest and absence of bad faith or ulterior motivation...." *Id.* at 386, 755 A.2d at 1290 (quoting *MacCalman v. County of Bucks,* 411 Pa. 316, 321, 191 A.2d 265, 267 (1963)).

Finally, and of particular significance here, the *Lobolito* Court noted, "[t]he Commonwealth Court has also explained that an employment contract between a township's supervisors and a police chief encompasses a governmental function (ensuring public safety) and thus was unenforceable against future supervisors who wanted to appoint a new police chief." *Id.* at 387, 755 A.2d at 1290 (citing *Falls Township,* 537 A.2d at 947.)

Ultimately, the *Lobolito* Court determined the governmental contract at issue was unenforceable against a successor school board. However, the Court preserved a claim for damages based upon promissory estoppel. Thus, the displaced contractor stated a claim for damages to the extent he detrimentally relied upon the unenforceable promise made by the predecessor school board.

■ In summary, there can be no reasonable dispute that an employment contract with a police chief encompasses a governmental function. *Falls Township.* As to such a function, a governing body's attempt to bind a successor body is unenforceable as contrary to public policy. *Lo-*

*bolito.* The purpose of the policy is to permit a governmental body " 'to function freely on behalf of the public and in response to the governmental power or body politic by which it was appointed or elected, unhampered by the policies of the predecessors....' " *Id.* at 385, 755 A.2d at 1289–90 (quoting *Mitchell,* 389 Pa. at 324, 132 A.2d at 878). Thus, the policy supports the integrity of governmental decisions. The application of this policy may be suspended in the face of considerations of urgency and necessity coupled with public interest and absence of bad faith or ulterior motivation. *Id.*

### III. Unenforceability on Grounds of Public Policy

■ The real question in this appeal is how to resolve conflict between civil service protection and the policy against binding successor bodies on governmental contracts. Stated differently, we must decide whether the council's eleventh-hour civil service hiring is unenforceable as against public policy.

■ Generally a court may hold a contract term unenforceable on the grounds of public policy "only after a careful balancing, in light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms." Restatement (Second) of Contracts § 178 cmt. b (1981). The Restatement fully identifies the process:

When a Term Is Unenforceable on Grounds of Public Policy

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

(2) In weighing the interest in the enforcement of a term, account is taken of

(a) the parties' justified expectations,

(b) any forfeiture that would result if enforcement were denied, and

(c) any special public interest in the enforcement of the particular term.

(3) In weighing a public policy against enforcement of a term, account is taken of

(a) the strength of that policy as manifested by legislation or judicial decisions,

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.

*See City of Wilkes–Barre v. City of Wilkes–Barre Police Benevolent Ass'n,* 814 A.2d 285 (Pa.Cmwlth.2002), *petition for allowance of appeal denied,* 573 Pa. 686, 823 A.2d 146 (2003). We therefore undertake this balancing.

We first weigh the interest in the enforcement of Westwood's employment contract. In this regard we consider the parties' justified expectations, any forfeiture that would result if enforcement were denied, and any special public interest in enforcement. Restatement, § 178(2).

Here, Westwood's expectations are justified only if the appointment was legal and complied with public policy at the beginning. At the very least, the timing of the appointment raises obvious questions as to whether any reliance on the appointment is justified. Further, no forfeiture is foreseeable. Westwood has the same remedy our Supreme Court granted in *Lobolito.* Thus, Westwood has a claim based on promissory estoppel to recover appropriate

losses incurred in reliance on his appointment. Finally, we acknowledge the public's interest in enforcement. Specifically, the public benefits from civil service appointments which help attract and retain as borough police officers faithful and conscientious persons whose value increase with experience. This policy supports the quality of governmental service.

Against these considerations we weigh the public policy against enforcement of Westwood's employment contract. In this regard, account is taken of the strength of the policy as manifested by judicial decisions, the likelihood that a refusal to enforce the employment contract will further that policy, the seriousness of any misconduct involved, and the directness of the connection between any misconduct and the employment. Restatement, § 178(3). We also take account of "considerations of urgency and necessity." *Lobolito.*

Here, the strength of the policy against enforcement of governmental contracts binding successor municipal bodies is quite strong. Indeed, the cases are almost unanimous, save one exception we consider hereafter. Also, it is likely that a refusal to enforce Westwood's employment contract here will further the public policy. Consistency in applying the policy at all levels of government makes outcomes predictable, thus encouraging responsiveness of government actors and discouraging litigation. Third, as to misconduct, neither the trial court nor the parties address this point. We note, however, the appointment was made by council members aware of the pending end of their terms. Finally, we agree with the trial court that neither urgency nor necessity required Westwood's appointment less than a month before the new council majority was seated. In the absence of some specific emergency, there is no apparent reason why the vacancy which existed since August needed to be filled in December rather than January.

Considering all of these matters, we conclude that the interest in enforcing Westwood's employment contract is clearly outweighed in these circumstances by the public policy against enforcement of governmental contracts against successor governing bodies. The strength and purpose of the public policy, the likelihood that the policy will be furthered by a ruling against enforcement, the lack of urgency or necessity and the lack of forfeiture are particularly important in reaching this conclusion.

## IV. Statutory Construction

■ We reach the same result by employing statutory construction of the police chief appointment provision, Section 1184 of The Borough Code, 53 P.S. § 46184, which provides in pertinent part (with emphasis added):

> In the case of a vacancy in the office of chief of police ... the appointive power may nominate a person to the [civil service] commission. It shall thereupon become the duty of the commission to subject such a person to a non-competitive examination, and if such person shall be certified by the commission as qualified, *he may then be appointed to such position,* and thereafter shall be subject to all the provisions of this subdivision.

Under this provision, appointment of a police chief is discretionary, not mandatory. Also, the statute is silent as to the timing of any appointment. No provision addresses the outcome where a discretionary appointment is made by an outgoing appointive authority. Thus, the statute is ambiguous as to the law controlling the timing of appointment.

Where, as here, a statute is ambiguous, we may attempt to ascertain the General Assembly's intent by considering the cir-

cumstances under which the statute was enacted, the former law on the same or similar subjects, and the consequences of a particular interpretation. *See* 1 Pa.C.S. § 1921(c).

The strong public policy against binding successor bodies predates by many decades civil service appointment for police chiefs. *E.g., Moore; McCormick.* The General Assembly could have expressed its intent to supplant preexisting limitations on the timing of appointment, but it did not do so when it enacted and reenacted the statutes. We conclude the General Assembly did not intend to silently modify application of the policy; rather, the General Assembly intended that preexisting limitations on the timing of appointments continue. *In re Holton's Estate,* 399 Pa. 241, 159 A.2d 883 (1960) (statutes are never presumed to make any innovation in existing common law beyond that expressly declared in their provisions). This interpretation gives effect to both the statutory appointment provisions and the precedent decisions of our Supreme Court.

As a result of our conclusion that Westwood's appointment is not enforceable against successor Borough council, we affirm the thoughtful decision of the able trial judge. Thus, we affirm summary declaratory judgment entered in favor of the Borough and against Westwood.

### ORDER

AND NOW, this 29th day of March, 2004, the order of the Court of Common Pleas of Allegheny County in the above captioned matter is **AFFIRMED.**