## LOCAL 85 OF THE AMALGAMATED TRANSIT UNION, AFL–CIO, Appellant

v.

## PORT AUTHORITY OF ALLEGHENY COUNTY.

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2003.

Decided Jan. 8, 2004.

Ernest B. Orsatti, Pittsburgh, for appellant.

Robert E. Durrant, Pittsburgh, for appellee.

BEFORE: McGINLEY, Judge, and SIMPSON, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge McGINLEY.

Local 85 of the Amalgamated Transit Union, AFL–CIO (Union) appeals the order of the Court of Common Pleas of Allegheny County (trial court) that dismissed the Union's amended petition to vacate the arbitration award and remanded all matters pertaining to the parties' March 5, 2002, agreement to arbitrate to the arbitrator.

The Union represents various Port Authority of Allegheny County (PAT) employees, such as bus drivers, trolley operators, maintenance employees, first level supervisors, secretaries, and claims representatives. PAT and the Union began negotiations [1] on a new collective bargaining agreement to replace the agreement that was to expire at midnight on November 30, 2001. The parties did not reach a new agreement before the agreement expired.

In an agreement dated March 5, 2002, the parties agreed to submit the remaining issues to binding arbitration. John E. Skonier (Arbitrator Skonier) was selected to serve as the sole arbitrator. Arbitrator Skonier had previously been appointed as a neutral factfinder in the negotiations by the Pennsylvania Labor Relations Board. Under the March 5, 2002, agreement, the parties established the following framework to resolve the issues:

1) On March 6, 2002, the parties were to exchange a final, complete package offer dealing with all issues.

2) On March 8, 2002, the parties were to meet and bargain with the assistance of the state mediation service in an effort to reach an agreement.

3) On March 19, 2002, if a settlement was not yet reached, the parties were to exchange another final package offer.

4) On March 22, 2002, the parties were to meet and bargain again with the assistance of the state mediation service in an effort to reach an agreement on all issues.

5) In the event that no agreement was reached, the parties were to have a three day hearing before Arbitrator Skonier to be scheduled April 15–17, 2002.

6) After the conclusion of the hearing before Arbitrator Skonier, and after he had an opportunity to deliberate over the evidence and issues, Arbitrator Skonier was to bring the parties together and attempt to mediate a collective bargaining agreement.

7) In the event that Arbitrator Skonier failed to broker an agreement, the parties were each required to submit to Arbitrator Skonier a comprehensive "last, best offer" addressing all remaining contract issues and Arbitrator Skonier was to select one of the offers which would become the collective bargaining agreement between the parties.

Also, the March 5, 2002, agreement provided that any disputes of any kind between the parties should be resolved at Arbitrator Skonier's discretion.

The parties proceeded to hearing before Arbitrator Skonier on April 15–17, 2002.

1. The Second Class County Port Authority Act (Act), Act of April 6, 1956, P.L. (1955) 1414, *as amended*, 55 P.S. §§ 551–563.5, governs the collective bargaining procedures between the parties.

Mediation sessions were held on April 24, 2002, and May 7, 2002. May 8, 2002, was established as the date for the parties to submit a "last best offer." The main issues were wage and pension increases requested by the Union, maintenance and health care changes proposed by PAT, and a disagreement over the procedures for arbitrating contractual grievances.

With respect to grievances, Arbitrator Skonier proposed that the parties adopt a rule that required the losing party in any grievance arbitration to pay the cost of the neutral arbitrator. PAT included the "loser pays" provision in its "last best offer" of May 8, 2002. With respect to health care, Arbitrator Skonier proposed a resolution that both parties accepted and included in their respective offers.

With respect to wages, on April 24, 2002, the Union proposed a 12% overall wage increase over the four years of the contract while PAT proposed 6% with a wage freeze in the first year. PAT then proposed 7.5% total increase in wages under the contract with a 7.2% pension increase. The Union wanted a portion of the wage increase in the form of a Cost of Living Adjustment (COLA) and PAT agreed. The Maintenance Apprentice Program was ultimately left unchanged.

At the conclusion of the May 7, 2002, mediation session, Arbitrator Skonier met with the Union Committee and stated that the percentage wage increases would be "plus COLA". This is the nub of the controversy. He really intended that the stated percentages included COLAs. Arbitrator Skonier repeated himself twice and both times he misspoke. The next day,

the Union submitted its "last best offer" and called for "percentage plus COLA" wage increases which mirrored Arbitrator Skonier's mistake. On May 8, 2002, Arbitrator Skonier adopted PAT's "last best offer" which included wage increases totaling 7.5% over the life of the contract, with COLA included in the 7.5%. The "loser pays" provision for grievance arbitration was also adopted.

On June 6, 2002, the Union petitioned to vacate the interest arbitration award and alleged that the Union relied on Arbitrator Skonier's misrepresentations concerning the wage increases and, as a result, he intentionally misled the Union into making a "last best offer" that was completely contrary to what he eventually accepted. Arbitrator Skonier accepted items in PAT's "last best offer" which he straightforwardly advised the Union were off the table and that such action disregarded due process and demonstrated indifference to justice. The Union also alleged that PAT did not timely submit its "last best offer" on time. Overall, the Union alleged partiality, corruption, irregularity, misconduct and/or fraud on the part of Arbitrator Skonier. The Union requested that the arbitration award be set aside and that the parties be ordered to select a new arbitrator to proceed *de novo* and to render a final and binding award.[2]

On October 25, 2002, the parties entered a stipulation that permitted the Union to file an amended petition to vacate but reserved to PAT any and all procedural objections to that amendment. On October 26, 2002, the Union amended its petition and asserted for the first time that the

---

2. On July 8, 2002, the Union petitioned for a rule to show cause why it was not entitled to the relief requested in its petition to vacate. The Union also requested a stay of the award. On August 9, 2002, the trial court issued a rule to show cause and denied the stay. This Court has already disposed of the Union's appeal of the denial of the stay in a decision filed August 22, 2003, at No. 1955 C.D.2002 and that issue is not before this Court. The Union raises this issue in its brief which was submitted before August 22, 2003.

agreement to arbitrate was unlawful and, alternatively, asserted that a provision of the Award was illegal.

Specifically, the Union alleged in its amended petition to vacate interest arbitration award:

15. At the May 7, 2002, meeting, with the Union officers and Union counsel, Arbitrator/Mediator Skonier, on at least three separate occasions, advised the Local Union officers, the International Vice President and Union counsel that he would approve and accept a last best offer from either party that included wage increases and cost-of-living allowances as follows:

Roll all previous cost-of-living allowance payments through November 30, 2001, into the base rate.

Up-date the dates of the cost-of-living clause and provide for quarterly payments as prescribed in the current agreement.

1/1/02 a wage freeze; the only payment shall be COLA payments.

12/1/02 raise all rates by 2% plus COLA.

7/1/03 raise all rates by 2.5% plus COLA.

7/1/04 raise all rates by 3% plus COLA.

. . . .

17. At the meeting on May 7, 2002, with Arbitrator/Mediator Skonier, the Union representatives voiced concern that one of the Union's proposals requiring that a mediation arbitration process be placed in the collective bargaining agreement was not receiving fair consideration and that a compromise proposal suggesting that the loser of any grievance arbitration pays for the cost of the arbitration was not acceptable, and therefore the Union was withdrawing its proposal on this subject.

. . . .

20. Each of the proposals set forth . . . were made in specific reliance upon the representations made to the Local Union by Arbitrator/Mediator Skonier.

. . . .

Effective midnight November 30, 2001, *suspend the cost-of-living* provision until 12:01 a.m. July 1, 2003.

Effective 12:01 a.m. July 1, 2003, starting with the first payroll period on or after July 1, 2003, reactivate COLA with the maximum set forth in Paragraph 3, Wages, below.

Effective December 1, 2002, apply a two (2%) percent increase to all wages and salary rates. (No COLA).

Effective July 1, 2003, a fifteen (15¢) per hour across the board increase shall be applied to all wage and salary rates in the same manner as under the 1997 agreement. For the year starting July 1, 2003, there shall be a maximum COLA payment of thirty-five (35¢).

Effective July 1, 2004, a twenty (20¢) an hour across the board increase shall be applied to all wage and salary rates in the same manner as under the 1997 agreement. For the year starting July 1, 2004, there shall be a maximum COLA payment of forty (40¢) cents.

. . . .

24. Despite the Union advising Arbitrator/Mediator Skonier that the Union's proposal regarding mediation arbitration was being withdrawn, Arbitrator/Mediator Skonier granted the proposal that the loser of any arbitration be required to pay for the arbitration hearing.

. . . .

26. Arbitrator/Mediator Skonier explained that when he told the Union representatives that he would award a

wage freeze plus cost-of-living for the first year, '2% plus cost-of-living the second year, 2.5% plus cost-of-living the third year, and 3% plus cost-of-living the fourth year, he did not really mean '*plus* cost-of-living'. Although acknowledging that he used the term 'plus cost-of-living' in discussing the issues with the Union, he really did not mean 'plus' cost-of-living to the various wage increases suggested. When Union counsel expressed shock and disbelief by such an irrational explanation, Arbitrator/Mediator Skonier responded, 'It's too late now, that's my Award.'

. . . .

30. The Union specifically relied upon the Arbitrator/Mediator's representations. The Arbitrator/Mediator, in making such representations, abused and misused the process by deliberately providing improper and misleading information to the Union in the various representations made to the Union.

31. . . . Had Arbitrator/Mediator Skonier said nothing to the Union representatives, an entirely different last best offer proposal would have been forthcoming. However, by Arbitrator/Mediator Skonier specifically advising and directing the Union as to what proposals he would accept as a last best offer, he purposely induced, misdirected and misled the Union into crafting a last best offer completely contrary to that which he accepted.

32. In addition, by accepting the Port Authority's last best offer proposal, which included items the Arbitrator advised the Union were 'off the table' and would not be considered, and his subsequent acknowledging to counsel that he did not 'realize' he made such an award, the Arbitrator breached his solemn duty to fairly and impartially evaluate evidence and proposals. Such a cavalier

disregard by the Arbitrator/Mediator of his obligations and responsibilities are [sic] so irregular and improper that his behavior and award disregards due process and demonstrates indifference to the justice of the result.

33. By counsel for the Port Authority agreeing with the Union not to submit reasons substantiating the Arbitrator's decision until after the award was announced, and nevertheless submitting such justification with its final proposal, the Union was substantially prejudiced. The irregularity of the proceeding and the misleading information provided by the Port Authority's counsel resulted in a basic unfairness to the process and requires the Arbitrator/Mediator's decision be set aside.

34. The Arbitrator/Mediator's representations were material misrepresentations designed to mislead the Union. Such conduct by the Arbitrator/Mediator provides sufficient irregularity, corruption, misconduct or fraud so as to materially prejudice the rights of the Union and requires that the Arbitration Award of May 8, 2002, be set aside.

35. It is averred that Arbitrator/Mediator Skonier exhibited obvious partiality toward the Port Authority by intentionally misleading the Union into believing that in order for him to accept a last best offer, certain proposals had to be included therein. The Union, relying upon his representations, included those proposals. Nevertheless, Arbitrator/Mediator Skonier accepted proposals completely contrary to the representations made to the Union.

. . . .

37. The Arbitrator/Mediator's conduct in awarding proposals which had been withdrawn, i.e., . . . the grievance mediation arbitration provision, and misleading the Union as to the wage increases

that he would grant and which should appear in a last best offer demonstrates an evident partiality, corruption, irregularity, misconduct and/or fraud substantially prejudicing the rights of the Union and denying the Union basic due process so as to require that the Arbitration Award of May 8, 2002, be voided and set aside.

38. The Arbitration Award ... contains a provision which requires the losing party in any grievance arbitration to be responsible for the entire fee of the neutral arbitrator in direct violation of the Second Class Port Authority Act, 55 P.S. § 563.2(o), which requires that the cost of arbitration be equally shared by the parties.

39. The interest arbitration proceeding before Arbitrator/Mediator Skonier was before a single arbitrator rather than a tri-partite panel as required by the Second Class County Port Authority Act, 55 P.S. § 562.(f), and, is therefore, unlawful and the Arbitration Award ... is rendered a nullity. (Emphasis in original).

Amended Petition to Vacate Interest Arbitration Award (Amended Petition), October 25, 2002, Paragraphs 15, 17, 20, 22, 24–26, 30–35, 37–39 at 4–10; Reproduced Record (R.R.) at 19–25.

The Union presented the deposition testimony of Joseph J. Pass (Attorney Pass), the attorney for the Union. Attorney Pass admitted that the parties agreed that they would submit a "last best offer." Deposition of Joseph J. Pass, October 21, 2002, (Attorney Pass Deposition) at 17; R.R. at 578. With respect to the "loser, pays" provision, Attorney Pass testified that he informed Arbitrator Skonier that it was "Good with me, but I've got to talk to my people about that, because they are pretty solid on this idea of mediation/arbitration in order to get these cases off." Attorney Pass Deposition at 28.[3] Attorney Pass believed that no agreement was ever reached on the "loser pays" provision. Attorney Pass Deposition at 28. Attorney Pass recounted how Arbitrator Skonier met with the Union's committee on May 7, 2002, regarding wages: "And he went from January 1, '02, no raise plus COLA, but you'll get COLA. The next was two percent plus COLA. The next was two-and-a-half percent effective July 1st, '03 plus COLA. And on July 1st of '04, three percent plus COLA." Attorney Pass Deposition at 48; R.R. at 596. Attorney Pass testified that Arbitrator Skonier repeated this wage information twice. Attorney Pass Deposition at 48–50; R.R. at 596–598. Attorney Pass relied on Arbitrator Skonier's misstatement about wages when he prepared the "last best offer". Attorney Pass Deposition at 56, 82; R.R. at 600, 622.

PAT presented the deposition testimony of Arbitrator Skonier. Arbitrator Skonier testified that at the April 24, 2002, session, Bruce Davidson Campbell (Attorney Campbell), attorney for PAT, stated that he would be willing to give wage increases of zero, two percent, two and one-half percent, and three percent for the four years of the contract and that a COLA could be backed into those numbers. Attorney Pass was present. Deposition of John Mark Skonier, September 17, 2002, (Arbitrator Skonier Deposition) at 87–88; R.R. at 319–320. At the same meeting, Arbitrator Skonier suggested that the parties agree that the loser in a grievance mediation proceeding pays. Arbitrator Skonier said, "Both Joe [Attorney Pass] and Bruce [Attorney Campbell] said, 'I can live with

---

3. The complete deposition testimony of Attorney Pass was not included in the Reproduced Record.

that. I can live with that.'" Arbitrator Skonier Deposition at 93; R.R. at 325. At the second mediation session, May 7, 2002, Attorney Pass informed Arbitrator Skonier that he was not happy with the "loser pays" provision of arbitration. Arbitrator Skonier Deposition at 112–113; R.R. at 344–345. At the conclusion of the May 7, 2002, session, Attorney Pass asked Arbitrator Skonier to meet with some of his board members. Someone requested Arbitrator Skonier to summarize the issues as of April 24. Arbitrator Skonier reported that he said, "On the wage, it's going to be effective January 1, 2002, zero, plus COLA.... December 1, 2002, two percent plus COLA; July 1, 2003, two and a half percent plus COLA; July 1, 2004, three percent plus COLA." Arbitrator Skonier Deposition at 125; R.R. at 357. At Attorney Pass's request, Arbitrator Skonier reiterated this wage information. Arbitrator Skonier Deposition at 127; R.R. at 359. Arbitrator Skonier admitted that he misspoke when he used the phrase "plus COLA" because he intended to factor in the COLA. Arbitrator Skonier Deposition at 130; R.R. at 362. Arbitrator Skonier did not realize his error until the next day when he received each party's "last best offer" by facsimile transmission. His error was obvious because the Union's offer was much higher than the parties discussed. Arbitrator Skonier Deposition at 131–134; R.R. at 363–366. Arbitrator Skonier believed that both parties agreed on the "loser pays" provision. Arbitrator Skonier Deposition at 144; R.R. at 376. Arbitrator Skonier did not accept that Attorney Pass reasonably held the position that Arbitrator Skonier's statement re-

garding wages was accurate because total money was discussed at the April 24, 2002, session. Arbitrator Skonier Deposition at 156; R.R. at 388.[4]

PAT presented the deposition testimony of Attorney Campbell. Attorney Campbell testified regarding the negotiations. With respect to the Union's wage offer in its "last best offer", Attorney Campbell characterized it as "totally different from anything we had talked about, or, as far as I know, received in writing from the union." Deposition of Bruce Davidson Campbell, October 31, 2002, at 88; R.R. at 725.

On February 4, 2003, the trial court dismissed the amended petition to vacate and ordered that all matters pertaining to the March 5, 2002, agreement be remanded to Arbitrator Skonier. The trial court determined that the Union did not timely raise its argument that the arbitration award was only advisory because there was only one arbitrator instead of the three required under the Act. The trial court determined that issue also failed on the merits and that Arbitrator Skonier's misstatement about the wage increases was not intentional. Therefore, under the narrow certiorari standard, there was no intent to deceive the Union, and the Union did not reasonably rely on the misstatements by Arbitrator Skonier. With respect to the "loser pays" provision of the award, the trial court determined that the issue was not withdrawn from consideration.

The Union contends that trial court erred as a matter of law and fact when it concluded that Arbitrator Skonier's admitted misstatements to the Union

---

4. PAT presented the deposition testimony of Larry E. Lutheran, director of employee relations for PAT, who testified that previously the parties had used a single arbitrator. PAT presented the deposition testimony of Paul Skoutelas, chief executive officer of PAT, who testified regarding the financial structure of PAT and its financial operations including its sources of revenue and its expenditures and the deposition testimony of Michael Palombo (Attorney Palombo), an attorney for PAT, who testified regarding the negotiations.

on May 7, 2002, as to the economic terms he was prepared to accept, were not irregularities in the proceedings that required vacating the arbitrator's award. The Union also asserts [5] that the trial court erred when it determined that the interest arbitration was lawful despite the fact that the Act mandates tripartite arbitration, and that trial court erred as a matter of law when it concluded that the "loser pays" provision of the award was not a violation of the Act.

## I. Legality of Single Arbitrator.

■ The Union contends [6] that the trial court erred when it found that the interest arbitration before Arbitrator Skonier was lawful despite the fact that Section 13.2 of the Act [7], 55 P.S. § 563.2(f), provides that interest arbitration to resolve a collective bargaining shall be before a board of three arbitrators. The Union asserts that contrary to the determination of the trial court it timely appealed this issue. The Union argues that there is no case law or statutory authority to support the trial court's conclusion that a suit to vacate an arbitration award must be made within thirty days of the execution of the agreement upon which the arbitration award was based. The Union raised this issue in its amended petition and argues that the amendment was not a change in the cause of action alleged in the original petition that the arbitration award was unlawful and that procedural irregularities were committed by Arbitrator Skonier.

The trial court determined:

I note initially that this argument, which goes to the very heart of the procedure adopted by the parties, was not timely raised by the Union. The parties' March 5, 2002 agreement clearly provides that they 'agree to proceed to *final* and *binding* interest arbitration.' Agreement of March 5, 2002, para. 4 (emphasis added). The parties further agreed that the single neutral arbitrator's award '*shall* be incorporated into the collective bargaining agreement which expired December 1, 2001, and *shall* constitute the parties' new collective bargaining agreement.' Id., para. 13 (emphasis added).

The union's argument that this agreement was a nullity was not only never

---

5. Our review of the trial court's resolution of the factual dispute raised by the amended petition is limited to determining whether there is substantial evidence of record to support the trial court's findings. Our review of issues related to the trial court's conduct of the hearings is limited to determining whether the trial court abused its discretion in resolving such matters. *Fraternal Order of Police, Lodge 5 v. City of Philadelphia*, 160 Pa.Cmwlth. 409, 635 A.2d 222 (1993), *petition for allowance of appeal denied*, 538 Pa. 616, 645 A.2d 1319 (1994). With respect to the arbitration award, this Court's review is the same as the trial court's and is quite limited. This Court is permitted to inquire into only four areas: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess of the arbitrator's powers; or (4) deprivation of constitutional rights. *Pennsylvania State Police v. Pennsylvania State Troop-*

*ers Association (Smith)*, 559 Pa. 586, 591, 741 A.2d 1248, 1251 (1999).

6. We have forgone the sequence of the Union's arguments.

7. This Section 13.2(f) of the Act was added by the act of October 7, 1959, P.L. 1266. Section 13.2(f) of the Act, 55 P.S. § 563.2(f), provides in pertinent part:

In the case of any labor dispute where collective bargaining does not result in an agreement, the dispute, with the written consent of both parties, shall be submitted to final and binding interest arbitration. The board of arbitration shall be composed of three persons, one appointed by the authority, one appointed by the labor organization representing the employes and a third member to be agreed upon by the labor organization and the authority.

raised before the arbitrator, it was not raised in this Court until the Union filed its Amended Petition on October 25, 2002, nearly five months after the filing of the initial Petition to Vacate and almost six months after the issuance of the arbitrator's award. This was untimely. *See* 42 Pa.C.S. § 5571(b) [8] (appeals to a court from the decision of another tribunal must be filed within thirty days). Nor is this issue saved by any rule permitting an appellant to delay fleshing out its position until the tribunal has explained its ruling.... Here, the facts on which the Union bases this challenge were fully apparent before the arbitration hearings even began, and certainly well before the arbitrator announced his award on May 8, 2002. (Citation omitted).

Trial Court Opinion, February 4, 2003, (Opinion) at 11–12; R.R. at 217–218.

This Court agrees with the trial court. The Union timely filed its petition to vacate on June 6, 2002. This original petition did not contain any reference to the illegality of the proceeding. Further, the Union did not raise this issue before the arbitrator. The Union waived this issue. *See West Shore Educational Association v. West Shore School District*, 72 Pa. Cmwlth. 374, 456 A.2d 715 (1983). Further, the Union could not raise this issue for the first time in the amended petition.[9]

## II. Arbitrator Skonier's Misstatments.

■ The Union also contends that the trial court erred as a matter of law and fact when it concluded that Arbitrator Skonier's admitted misstatements of the economic terms he was prepared to accept were not irregularities in the proceedings that required the trial court to vacate the award. The Union's position is that Arbitrator Skonier expressly told the Union Committee his position on wages. The Union then relied upon this representation and presented its "last best offer" which included a wage proposal that was exactly the same as the one Arbitrator Skonier presented to the Union.

The Union asserts that it was not clear at the April 24, 2002, session where the parties stood with respect to wages. Attorney Pass testified that there was no discussion on April 24, 2002, regarding "backing COLA out of those wage proposals".[10] For proof, that COLA was not

---

8. Section 5571(b) of the Judicial Code, 42 Pa.C.S. § 5571(b), provides:

 **(b) Other Courts.**—Except as otherwise provided in subsections (a) and (c), an appeal from a tribunal or other government unit to a court or from a court to an appellate court must be commenced within 30 days after the entry of the order from which the appeal is taken, in the case of an interlocutory or final order.

9. Because this Court has determined that the Union failed to preserve this issue, this Court need not address its merits.

10. The Union's attorney, Ernest B. Orsatti, questioned Attorney Pass about wages:

 Q: Now, in that discussion ... on April 24th. Was there any mention about backing COLA out of those wage proposals?

 A: Absolutely not. There wasn't any discussion. And if you look at my notes and Mr. Campbell's notes and Mr. Palombo's notes, which were prepared and submitted, there is not a mention of cost of living in any of those notes, because it wasn't discussed.

 And had it been brought up, I certainly would have had for example, if COLA was brought up that it was going to be backed out, the first question instinctively has to be 'well, how much is going to be backed out'; because their proposal, the proposal on wages, was 2 percent the first year, 2–1/2 percent the second year and 3% the third.

 And if he was going to back out cost of living, I wanted to know how much of that money is coming out. That would be I can't imagine how you could even think of anything. If they're going to back out all of

mentioned in the discussions of April 24, 2002, when Attorney Pass, Attorney Campbell, Attorney Palumbo, and Michael Siano (Mr. Siano), Union International Vice President, were in the room at the same time, the Union points out that the notes from the day's discussions that each party submitted to Arbitrator Skonier failed to mention COLA. The Union also adds there was no reason to submit an offer on wages it knew was unacceptable. The Union argues that it detrimentally relied on Arbitrator Skonier's misstatements which led to the submitted offer that was rejected.

> The trial court rejected this argument: The Union argues that the arbitrator's erroneous summary of the wage increase issue was an 'intentional misstatement' that would satisfy narrow certiorari. I disagree. The arbitrator himself testified that his statements—to the effect that the percentage wage increases he viewed as appropriate were in addition to COLAs, when it was his understanding and intention to state that the increases should be those percentages including COLAs—were solely the result of inadvertent error on his part. I have reviewed at length the deposition testimony and other evidence submitted by the parties on this issue and I find his testimony to be credible and consistent with all of the available evidence. The Union has presented no evidence from which I could conclude that the arbitrator's misstatement was made with an intent to deceive the Un-

ion or arose out of collusion with the Port Authority. His misstatement, at worst, was no more than a mistake of fact. It did not derive from bias, collusion or other irregularity in the proceedings, and hence does not provide grounds for this Court to upset the award under the narrow certiorari standard.

What is more, I find that under the circumstances recited above, the Union could not have reasonably relied on the erroneous statements made by the arbitrator. Therefore, I will not disturb the arbitrator's award on this ground. The collective bargaining in this case was a long and deliberate process, covering more than two months of discussion and grudging incremental concessions by the parties. As its initial position, the Union sought a 12% total wage increase (including COLA), and a 7.2% pension increase. After many long hours of mediation in both joint and private meetings, and after the arbitrator had the opportunity to hear and deliberate over the evidence and thus make credibility findings, and after the arbitrator informed the Union's counsel that it found the Port Authority's evidence to be credible on the key issue of the Authority's inability to pay a large wage increase because of the dire financial condition of the Port Authority, the arbitrator eventually, by the time of the April 24 mediation session, got the Union to prepare

---

the cost of living and say that 2–1/2 is all cost of living, you don't have a raise.

So that's a very key issue, and it wasn't discussed. If it were, it would have certainly been reflected in Mr. Palombo's notes, Mr. Campbell's notes, or mine, and it's not. And I believe—I read the testimony of Mr. Skonier. I believe he just made a mistake because he said to me when he left on the 24th, his notes were jumbled. He

wasn't sure. 'Please, I want to make sure everyone's on the same page.'

And these notes that are reflected here is exactly—we almost—what Mr. Campbell wrote, what Palombo wrote, what I wrote, are almost identical and at no time is there any mention of cost of living.

Attorney Pass Deposition at 35–37; R.R. at 588–590.

itself for a 7.5% total wage increase (including COLA).

. . . .

... Near the outset of the May 7 mediation session, counsel for the Union brought up the topic of revisiting the wage issue understandings from the April 24 session. This got an explosive reaction from the Port Authority. Arbitrator Skonier then informed the parties that he was not moving away from his thinking on those issues as described on April 24, and that they should move on to the maintenance issue.... Then, around 3:00 p.m., as arbitrator Skonier was packing up his materials to leave for the airport, arbitrator Skonier asked counsel for the Union if it would be helpful if he talked to the Union representatives directly. The Union's attorney stated that this would be helpful, so arbitrator Skonier met with counsel for the Union and the Union representatives.... This private meeting lasted about fifteen minutes.... This is where arbitrator Skonier made the misstatement that there would be a 7.5% wage increase plus COLA.... Arbitrator Skonier otherwise accurately described the understanding that had been reached on these other issues on April 24. The Union representatives then thanked arbitrator Skonier for meeting with them, and the meeting was over....

Given this context it is difficult to conclude that the Union *reasonably* relied on the misstatement, particularly: where arbitrator Skonier had informed the Union at the outset of the May 7 mediation session that he was not interested in revisiting the issues addressed on April 24; where there had been no back-and-forth substantive meetings on May 7 addressing the wage issue; where the misstatement occurred, as it did, for the first and only time, in a final, summary, 15 minute private meeting with Union representatives as arbitrator Skonier was heading out the door; and where the wage increase suggested by the misstatement would have awarded the Union an *uncapped* COLA that they never requested and a much larger total money award than they ever requested throughout this long collection process. (Emphasis in original).

Opinion at 14–19; R.R. at 220–225.

The trial court's review was limited to questions of jurisdiction, the regularity of the proceeding, questions of excess in the exercise of power, and constitutional questions. *Washington v. Police Department of Washington*, 436 Pa. 168, 259 A.2d 437 (1969). The trial court found credible Arbitrator Skonier's testimony that there was no intent to deceive the Union. The trial court also determined that the Union could not have reasonably relied on the misstatements given the discussions on the wage issue which previously occurred. Arbitrator Skonier testified that, at the first post-hearing mediation session, Attorney Campbell informed Attorney Pass and Mr. Siano that PAT was willing to offer increases of zero, two percent, two and one-half percent, and three percent over the life of the contract with COLA backed into that total. Arbitrator Skonier Deposition at 86–89; R.R. at 318–321. Attorney Campbell corroborated this testimony. Attorney Campbell Deposition at 49–50; R.R. at 694–695. Attorney Palumbo essentially corroborated this testimony as well. Deposition of Michael Palombo, October 25, 2002, at 32–33; R.R. at 785–786. Given that the Union was informed of PAT's position, the trial court reasonably deduced that the Union did not reasonably rely on Arbitrator Skonier's misstatements. There was no error.

■ The Union also contends that the trial court erred as a matter of a law when

it imposed the additional burden on the Union of proving that Arbitrator Skonier acted with an intent to deceive the Union or was the result of any collusion with PAT. The Union asserts that the requirement that it establish an intent to deceive is unsupported by the case law. The Union asserts that notwithstanding Arbitrator Skonier's claim that it was unintentional, the Union and this Court must presume that Arbitrator Skonier intended the natural and probable consequences of his act, that the Union would include the wage proposal in its "last best offer".

Essentially, the Union alleges that there were irregularities in the proceedings which require that the arbitration award be set aside. Under the narrow certiorari standard of review of an arbitrator's decision, the review of the trial court is limited to questions of jurisdiction, the regularity of the proceeding, excess in the exercise of power, and constitutional questions. *Washington.*

This Court has determined that the "essential elements of due process are notice and an opportunity to be heard in a full and fair hearing before an impartial decisionmaker." *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,* 725 A.2d 206, 210 (Pa.Cmwlth.1999). In *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,* this Court affirmed the

order of the Court of Common Pleas of Philadelphia that denied Fraternal Order of Police, Lodge No. 5's (FOP) petition to vacate or modify an interest arbitration award in part because the FOP failed to establish that it did not receive proper notice, an opportunity to be heard, that the arbitration panel was biased or predisposed against it, or that it did not receive a fair hearing. *Id.*

Here, there is no question that the Union received proper notice and an opportunity to be heard. The Union alleged the prerequisite facts under the appropriate standard. The Union failed to shoulder its burden of proof that Arbitrator Skonier was biased or that he failed to provide a fair hearing in order to prove that there were irregularities in the proceedings that required that the arbitration award be set aside. This Court finds that the trial court did not impose an additional burden on the Union.[11] There was no error.[12]

### III. "Loser Pays" Grievance Arbitration.

Finally, the Union contends that the trial court erred as a matter of law when it concluded that the "loser pays" provision in the arbitration award was not a violation of the Act. The Union asserts that the provision that the "loser pays" in

11. The Union also argues that it is entitled to a presumption of intent, such as would be applicable in a criminal case. Absent any statute or case law which provides any entitlement to such a presumption, this Court refuses to unilaterally do so.

12. The Union also asserts that the trial court erred when it found that the Union's final proposal would have permitted a wage increase of up to 15.75% and was clearly outside the parties' prior negotiating range which had been between 6% and 12% so that the Union could not have reasonably relied on Arbitrator Skonier's misstatement. The Union believes that the trial court failed to re-

alize that the final Union proposal was a guaranteed wage increase of 7.5% with the possibility that additional money could be added if the cost of living increased. However, the Union's final offer on May 8, 2002, provided for the following:

Effective 12/1/01: COLA only
Effective 12/1/02: 2% in addition to COLA
Effective 7/1/03: 2.5% in addition to COLA
Effective 7/1/04: 3% in addition to COLA

The trial court found that PAT's final offer of a 7.5% increase over the life of the contract including COLAs accurately reflected the parties' April 24, 2002, discussions.

a grievance arbitration procedure is contrary to Section 13.2(*o*) of the Act.[13]

The trial court determined that there was no violation of the Act:

Next, the Union argues that the 'loser pays' provision for grievance arbitrations was withdrawn by the Union from the arbitrator's jurisdiction and was, in any event, illegal. It is clear from the evidence presented in this Court that the subject of improving the quality of the grievance arbitration process was squarely presented to the arbitrator by the parties. The fact that the Union withdrew its affirmative support for one proposed *solution* to that question does not mean that the issue as a whole was withdrawn from consideration. Furthermore, under the cases such as *Fraternal Order of Police v. Hickey*, 499 Pa. 194, 452 A.2d 1005 (1982),.. the parties would have been free to agree to substitute the 'loser pays' provision for the alternative procedures set out in the statute. It was therefore an available alternative for the Port Authority to propose and for the arbitrator to adopt. (Emphasis in original).

Opinion at 19; R.R. at 225.

A review of the record reveals that the Union did not pursue the issue of whether the "loser pays" provision violated the Act before the arbitrator. Similarly, in the petition to vacate, the Union stated that Arbitrator Skonier granted the "loser pays" provision even though the Union advised him that it was withdrawing its proposal. The Union did not assert that such a provision violated the Act. The illegality of the provision was raised for the first time in the amended petition to vacate. As with the Union's contention that the proceeding before one arbitrator, rather than three, violated the Act, the Union failed to preserve this issue.

Accordingly, this Court affirms.

## ORDER

AND NOW, this 8th day of January, 2004, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is affirmed.

---

**13.** Section 13.2(*o*) of the Act, 55 P.S. § 563.2(*o*), provides:

The authority shall submit disputes involving interpretation of specific provisions of collective bargaining agreements, including formal written supplemental understandings and agreements directly related to contract provisions, in effect from time to time, to grievance arbitration. In any grievance arbitration, the arbitrator must base the award upon the express terms and conditions of a labor agreement between the authority and the authorized representative. Each party shall pay one-half of the expenses associated with any arbitration which may be conducted pursuant to this subsection.