IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| City of Allentown | : |
| | : |
| v. | : No. 1802 C.D. 2014 |
| | : Argued:  May 6, 2015 |
| International Association of | : |
| Fire Fighters Local 302 | : |
| | |
| International Association of | : |
| Fire Fighters Local 302 | : |
| | : |
| v. | : |
| | : |
| City of Allentown, | : |
| Appellant | : |


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
                   HONORABLE RENÉE COHN JUBELIRER, Judge
                   HONORABLE ROBERT SIMPSON, Judge
                   HONORABLE MARY HANNAH LEAVITT, Judge
                   HONORABLE P. KEVIN BROBSON, Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE ANNE E. COVEY, Judge


OPINION BY
PRESIDENT JUDGE PELLEGRINI                 FILED: August 7, 2015


The City of Allentown (City) petitions for review of an order of the Lehigh County Court of Common Pleas (trial court) reviewing an interest arbitration award issued by an arbitration panel under the Policeman and Fireman Collective Bargaining Act (Act 111).[1]  We affirm in part and reverse in part.

---

[1] Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§217.1-217.10.  Section 1 of Act 111 provides, in relevant part:
**(Footnote continued on next page…)**

**I.**

The City and the International Association of Fire Fighters Local 302 (Union) were parties to a collective bargaining agreement (CBA) governing the wages, hours and working conditions of the employees of the City's Fire Department (Department) who provide firefighting and emergency medical services that was set to expire in December 2011. Pertinent to our discussion regarding manning, the CBA provided that the City Fire Department shall have 140 sworn personnel with an on-duty shift strength of no less than 28 firefighters. Regarding pensions, the CBA provided:

- that any firefighter was eligible to retire regardless of age;

- that any firefighter retiring after January 1, 2005, received an annual cost of living adjustment (COLA), but the pension benefit should not exceed one-half of the current salary being paid to firefighters of same rank that the pensioner had prior to retirement as provided for under Section 4322 of the Third Class City Code;[2] and

**(continued…)**

[F]iremen employed by a political subdivision of the Commonwealth … shall, through labor organizations …, have the right to bargain collectively with their public employers concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits….

43 P.S. §217.1.

[2] Act of June 30, 1931, P.L. 932, *as amended*, 53 P.S. §39322. Section 4322(a)(2) states, in relevant part, that a fireman's pension "shall be determined by the monthly salary of the member at the date of vesting … or retirement, or the highest average annual salary which the member received during any five years of service preceding retirement, whichever is the higher, **(Footnote continued on next page…)**

- that any firefighter could purchase up to 4 years of pension time after the firefighter had contributed to the Department's Pension Fund for 16 years.[3]

When the parties could not reach an agreement on a new CBA, the City declared an impasse and sought binding interest arbitration under Act 111[4] before an arbitration panel.[5] At hearing, the City argued that the CBA pension provisions violated the Third Class City Code, and that the illegal minimum

---

**(continued…)**

… and … shall be one-half the annual salary of the member at the time of vesting … or retirement computed at the monthly or average annual rate, whichever is the higher." 53 P.S. §39322(a)(2).

[3] Additionally, there was a corresponding provision in place in Section 145.18.7 of the City's Administrative Code, to implement the award regarding early retirement, stating:

> Effective January 1, 2005, every covered employee having contributed sixteen years (16) into the Allentown Fire Department Pension Fund shall have the option for early retirement as set forth as follows. The covered employee shall be entitled to have full credit for each year or fraction thereof, not to exceed four (4) years of service upon his/her payment into the Fire Pension Fund, an amount equal to that which he/she would have paid had he/she been a member during the period he/she desires credit…..

[4] "'Interest arbitration' is the arbitration that occurs when the employer and employees are unable to agree on the terms of a [CBA]. 'Grievance arbitration' is the arbitration that occurs when the parties disagree as to the interpretation of an existing [CBA]." *City of Philadelphia v. International Association of Firefighters, Local 22*, 999 A.2d 555, 558 n.2 (Pa. 2010) (citation omitted).

[5] *See* Section 4(b) of Act 111, 43 P.S. §217.4(b) ("The board of arbitration shall be composed of three persons, one appointed by the public employer, one appointed by the body of … firemen involved, and a third member to be agreed upon by the public employer and such … firemen….").

manning and sick leave provisions impact the overtime provisions which then, in turn, inflate pension benefits.

Vijay Kapoor, the Director of Public Financial Management's Workforce Consulting, testified that "[T]his is all interrelated. You can see how minimum manning impacts overtime, how sick leave impacts overtime, how overtime impacts pension. All that put together puts a strain on [the City], which is, frankly, different than other third class cities." (Reproduced Record (RR) at 468a). He explained that the City got into this dire financial situation due in part to the former CBAs which provided pension benefits levels and minimum age requirements that violated the Third Class City Code. (*Id.* at 476a-477a). He stated that the significant amounts of overtime generated during the period of calculating firefighters' final salaries and the ability to purchase four years of nonmilitary service also contributed. (*Id.* at 477a). He testified that a number of third class cities are struggling with the minimum manning requirements and they have been eliminated or significantly scaled back in those other cities. (*Id.* at 487a). He stated that when the City of Bethlehem's Fire Department took over EMS duties, there was very little impact on the amount of overtime, but the transfer of EMS duties to the Department coincided with an increase in the minimum manning requirements under the CBA and that overtime increased as well. (*Id.* at 490a). He stated that both the Union and the police union had renegotiated pay freezes at the end of their CBAs. (*Id.* at 488a-489a).

Fire Chief Robert Scheirer explained the assignment of overtime and testified that he did not believe that there were a lot of problems with the system

4

until overtime became included in the calculation of the firefighters' pensions under the prior CBAs. (RR at 480a). He stated that the firefighters realized that if they did not work a lot of overtime in the first couple of years of the CBA, they could start accepting overtime and work in large quantities at the end of the CBA to spike their pensions because it was now part of the pension calculation. (*Id.*).

Ed Pawlowski, the City's Mayor, testified regarding the City's dire financial situation. He explained that they have used casino revenues, comprising 4% of the City's general funds, to help absorb the increasing costs in salaries, fuel and pension costs, but that "it doesn't even come close to addressing some of these equities that we talked about today with the rising pension costs because of early retirement, and the increases because of some of the other factors, like overtime and so forth that have played into these numbers." (RR at 494a). He stated that "the biggest thing that is affecting us and will affect this City for years to come is the pension challenge," and that the unfunded liability from the City's fire and police pensions will increase to 25% of the City's general fund by 2015 under the current provisions. (*Id.* at 495a). He stated that the City's budget has spiked tremendously due to the early retirement of police and firefighters with a cumulative impact of 34.5 million dollars. (*Id.* at 496a).

Ultimately, the panel eschewed holding another hearing and issued an award in July 2012 that was to be in effect from January 1, 2012, through December 31, 2015. The panel noted the City's dire financial situation and its relationship with the CBA pension provisions stating:

The voluminous record in this case leaves the City's claim that it is faced with significant financial difficulties now and, at least, over the next few years substantially unchallenged. The City has also established on this record that the firefighters' pension plan suffers from a significant underfunding shortfall. There is no reason to believe that this situation will be substantially improved in the near term without the implementation of some structural changes.

Certainly, the fact that a number of the City's employees, including those who have the right to bargain collectively regarding wages, have agreed to freeze wages for a period of time supports the City's position. This fact, standing alone, corroborates the City's claim that current financial circumstances mandate recognition by the Panel of the City's need for relief.

Additionally, the evidence in the record supports the City's claim that its funding obligations under the firefighters' pension plan have become critically onerous. In fact, it was most unfortunate that a significant number of long term, experienced, professional and dedicated firefighters believed that they had to take early retirement in order to protect the pension benefits they earned under the terms of the existing pension plan. These facts present, in the Panel's opinion, a need to provide the City with relief insofar as the structure in the firefighters' pension plan is concerned.

(RR at 33a).

As a result, the award eliminated the provision that the City had to have a set number of firefighters and reduced the minimum manning scheduling requirement to 25 per shift.[6] Regarding pensions, the arbitration panel eliminated,

---

[6] Paragraph 3 of the Award provides:
**(Footnote continued on next page…)**

6

effective January 1, 2012, the ability of firefighters to purchase four years of pension time, as well as eliminating the provision that firefighters could retire at any age;[7] and eliminated the COLA benefits for retired firefighters.

**(continued…)**

> Article 21 (Staffing), Article 31 (No Layoff or Furlough) and Article 26(B) shall be suspended until December 31, 2015; reinstated on that date; and subject to negotiation in the next round of bargaining. All restrictions or requirements on the City's utilization of manpower and any requirement that the City employ a certain number of firefighters as stated in the current [CBA] shall be suspended until December 31, 2015.
>
> *Instead, there shall be a manning scheduling requirement of twenty-five (25) per shift, which shall include all scheduled personnel including command positions.*
>
> The City shall not have any obligation to recall firefighters to replace any scheduled firefighter through any means if the number of firefighters who report to work on any shift falls below twenty-five (25), if such absence is due to any of the following: the use of a sick day, if the firefighter is on work related or non-work related disability leave, or due to the use of any other paid or unpaid leave, except for a previously scheduled vacation day or a previously scheduled personal day.

(RR at 34a-35a) (emphasis added).

[7] Paragraph 6 of the award states, in relevant part:

> (a) … The City shall solely provide the minimum required pension benefit as set forth in the Third Class City Code…. For purposes of calculating pension benefits for firefighters hired on or after the date of this Award salary shall be defined solely as base salary plus longevity. Monthly salary shall be defined as annual salary plus longevity divided by twelve (12). By way of clarification, a firefighter will be eligible to retire only after 20 years of service and reaching age 50…. The only optional benefit that the City

**(Footnote continued on next page…)**

Both parties filed petitions to vacate the award in the trial court, but by joint stipulation approved by the trial court, the matter was remanded for a second hearing before the arbitration panel to offer evidence that went to the minimum manning and buyback provisions mentioned above.

Jeremy Warmkessel, a current Fire Department Lieutenant, testified that there are 120 men in the Department that are run out of five stations and that they have seven engines and one aerial. (RR at 108a). He stated that there is one battalion chief; one captain; seven lieutenants; and depending on the shift, the rest are journeymen firefighters. (*Id.* at 110a). He testified that they work approximately 28 men on each of four platoons working four days on from 6:30 a.m. to 3:30 p.m., followed by four days off, followed by four nights on from 3:30

_____

**(continued…)**

> shall provide to new hires shall be a service increment determined according to the formula and requirements contained in the Third Class City Code up to a cap of $200 per month.
>
> (b) Effective immediately, the pension benefit calculation for current firefighters found in Article 27(A) applicable to current firefighters who retire in the future shall be modified so that such firefighters shall receive the graduated pension calculation currently listed in Article 27(A), but the pension calculation found in Article 27(C) shall be based on base salary, longevity, holiday and festive pay, shift differential and overtime, but overtime shall be capped at 10% of the firefighter's monthly base salary….
>
> (c) Effective on January 1, 2012, the non-military buy back and the early retirement provisions (Article 30) of the current pension plan shall be eliminated.

(RR at 36a-37a).

p.m. to 6:30 a.m., followed by four nights off. He testified that while two of the platoons are on, the other two are off.

Art Martynuska, president of the Pennsylvania Professional Firefighters Association, presented safety studies showing that the typical effective extinguishment of a residential structure requires eight people for the first alarm and eight additional firefighters. He also offered for examination the standard safety equipment worn and used by firefighters. He testified that the ISO, or insurance services office classification for the City, was relatively good at three on a scale of one to ten, and that insurance rates are lowered two to three percent for each lower classification. (*Id.* at 120a, 153a). He conceded that a number of third-class cities do not have minimum manning per shift.

Fire Captain Christian Williams, who also serves as the Union's vice president, testified, "We believe that having a minimum staffing requirement for shift strength is important to make sure that we have enough members on the job to maintain a safe working environment." (RR at 155a). He stated, "Decreasing the number of people changes our working conditions into an unsafe manner." (*Id.*). In making this assessment, he testified that he relied on independent analysis from outside agencies from years ago and his personal experience in his career. He stated that the staffing levels under the prior CBA were based on historical practice and a 1988 report done by Buracker and Associates that was offered into evidence. He testified that the report states that the necessary 131 operational personnel works out to 32 to 33 firefighters per shift, and the prior CBA provided for a minimum staffing of 30 per shift. He stated that the injury rate has been declining,

9

most markedly after the prior CBA was implemented because it required the City to maintain a safe level of personnel on shift at any given time. (*Id.* at 164a).

In November 2013, the arbitration panel issued a supplemental opinion and award which re-issued the July 2012 award and re-dated it September 23, 2013. (RR at 47a-55a). Both the City and the Union filed petitions in the trial court to review and vacate parts of the new award.

The City sought to vacate the award to the extent that it imposed the manning requirement of 25 personnel per shift. The Union sought to vacate Paragraph 6 of the award regarding the elimination of the non-military buy back in Article 30 and the COLA provisions in Article 29 because the award violated Article 1, Section 17 of the Pennsylvania Constitution.[8] The Union also argued that the actuarial report introduced by the City and relied upon by the panel of arbitrators did not comply with the requirements of Municipal Pension Plan Funding Standard and Recovery Act (Act 205).[9]

---

[8] Article 1, Section 17 provides, in relevant part, that "nor any law impairing the obligation of contracts … shall be passed." Pa. Const. art. 1, §17.

[9] Act of December 18, 1984, P.L. 1005, 53 P.S. §§895.101-895.803. Compliance with Act 205 is mandatory and Chapter 3 of Act 205 governs the minimum funding standards for municipal pension plans. *City of Scranton v. Fire Fighters Local Union No. 60*, 85 A.3d 594, 598 (Pa. Cmwlth. 2014). "[I]n the event of an actual conflict between Act 205 and a pension plan modification in a [CBA], the requirements of Act 205 must be given effect." *Id.* at 599 (citations omitted). "Act 205 also applies to pension plan modifications in Act 111 arbitration awards." *Id.* (citations omitted). "[T]he record before the arbitrators must demonstrate compliance with the cost estimate requirements of Act 205 and must support the award." *Id.* at 602.

## II.

Citing *International Association of Fire Fighters, Local 669 v. City of Scranton*, 429 A.2d 779 (Pa. Cmwlth. 1981),[10] the trial court rejected the City's petition to vacate the portion of Paragraph 3 regarding the minimum staffing requirements of Article 26(B). The court noted that "issues rationally related to firefighter safety are subject to arbitration," and that "the Court is required to evaluate the rational relationship between staffing levels and the employees' duties." (RR at 886a). The trial court found that the Union presented testimony regarding the City's population and "raised the implications of on-duty staffing numbers on firefighter safety," and noted the evidence that was presented "to demonstrate the greater the number of on-duty firefighters, the less likely it is that they will be injured in the course of their employment." (*Id.* at 886a-887a). The court concluded that "while total employment numbers are matters of managerial prerogative, the specific number of individuals on duty at any given time bears a rational relationship to the duties and safety of the firefighters," so that the issue

---

[10] As we explained in *City of Scranton*, 429 A.2d at 781-82:

> [W]e find that Act 111 does not remove from the scope of a municipality's managerial decision-making the determination of the total number of firefighters it deems necessary for the level of fire protection it wishes to afford to its citizens. Although the Court acknowledges that the line between safety and numbers is finer in protective services such as fire and police work than in most other occupations, we nevertheless find that safety can be adequately protected by more finely honed collective bargaining on specific issues as discussed, *infra*. The safety of a firefighter is far more rationally related to the number of individuals fighting a fire with him, or operating an important piece of equipment at a fire, than it is to the number of members of the entire force.

11

was within the arbitrators' jurisdiction and denied the City's petition to vacate that portion of the award. (*Id.* at 887a).

Regarding the elimination of purchase of service time for pension benefits, the trial court initially determined that it did not violate Article 1, Section 17, because neither party cited any statutory or case law expressly granting or precluding such a benefit and that it stems solely from their agreement. The court concluded that because it was not a statutorily mandated benefit, those benefits could be reduced. Nevertheless, the court held that the "award may not modify the dates of retirement for those firefighters who already retired pursuant to the non-military buy back" because "[m]odification in that context is expressly precluded by the Home Rule Charter Law restriction on reducing benefits[11] to which the City is subject." (RR at 897a). Additionally, in "an effort to strike a balance between the parties' respective interests," the court allowed any firefighter to buy four years military time who retired within 60 days of its order. (*Id.*). The court affirmed the award in this regard with respect to current employees because it determined that the non-military buy back was not statutorily mandated and the panel was authorized to modify this provision in the CBA without violating the City's home rule charter.

---

[11] *See* Section 2962(c)(3) of the Home Rule Charter Law, 53 Pa. C.S. §2962(c)(3) ("A municipality shall not … [b]e authorized to diminish the rights or privileges of any former municipal employee entitled to benefits or any present municipal employee in his pension or retirement system.").

12

Approving the elimination of the COLA provision, the trial court noted that it only applied to "any covered employee retiring on or after January 1, 2005," and that it "is not a vested right *ad infinitum* into the future." (RR at 899a). Rather, the court found that it was only a vested right for any covered firefighter who retired between January 1, 2005, and December 31, 2011, but that it did not apply to those who were hired or retired after that date. Nevertheless, the court explained:

> The Court recognizes that the [COLAs] may have already been paid to those who retired from active service since December 31, 2011. It would be impractical and raise constitutional issues of a deprivation of property rights to require those who retired since December 31, 2011 to pay back those [COLAs] they received. For that reason, and in order to provide fair notice to all interested parties, the termination of the COLA for any firefighter who retired after December 31, 2011 will take effect in 60 days from the date of this Order.

(*Id.* at 900a). As a result, the court affirmed the award in this regard as it applies to employees hired after December 31, 2011, or to those who retired after that date.[12]

---

[12] The trial court also denied the Union's petition to vacate those portions of the award that changed sick leave, capped overtime at ten percent of the employee's monthly base salary for pension calculation purposes, and remanded to the arbitration panel to consider the City's claim that under the CBA, the panel was required to remove any pension provisions from the CBA deemed to be unlawful by the Auditor General's Office. (RR at 890a, 895a, 901a).

13

# III.

We granted the City's petition for review[13] of the trial court's order[14] limited to the following issues:

- whether the shift manning requirement is a violation of the City's managerial rights;

- whether the arbitration panel had the authority to eliminate the provisions of the CBA that allowed firefighters to buy back up to four years for the calculation of pension benefits; and

- whether the trial court properly affirmed the elimination of the non-military buy back and COLA and yet allowed these provisions to continue for 60 days after filing its order.[15]

---

[13] *See Pennsylvania Turnpike Commission v. Jellig*, 563 A.2d 202, 204 (Pa. Cmwlth. 1989), *aff'd sub nom. Jellig v. Kiernan*, 620 A.2d 481 (Pa. 1993) ("[W]hen a petitioner files a petition for review alleging that the trial court order failed, or that the trial judge refused, to include the language allowing an interlocutory appeal by permission prescribed in Section 702(b) of the [Judicial] Code, this Court's grant of that petition seeking review by permission has the same effect as if a petition for permission to appeal had been filed and granted.") (citations omitted).

[14] Our review in Act 111 arbitration awards is permitted under the confines of the narrow certiorari scope of review. *See Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt),* 656 A.2d 83, 89-90 (Pa. 1995). "[T]he narrow certiorari scope of review limits courts to reviewing questions concerning: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess in exercise of the arbitrator's powers; and (4) deprivation of constitutional rights." *Id.* An arbitration panel exceeds the limits of its powers when its award orders an "illegal act." *City of Pittsburgh v. Fraternal Order of Police, Fort Pitt Lodge No. 1*, 938 A.2d 225, 230 (Pa. 2007). *See also Commonwealth v. Pennsylvania State Troopers Association*, 23 A.3d 966 (Pa. 2011).

[15] We also granted review to determine whether the trial court's remand to the arbitration panel to consider whether the City complied with the requirements of Act 205 was within its power given its limited scope of review. The City contends that the trial court improperly remanded the matter to the arbitration panel to determine whether the Act 205 actuarial study **(Footnote continued on next page…)**

14

## A.

With regard to the validity of the shift manning requirements imposed by the arbitration panel, as the Supreme Court has explained when reviewing a disputed provision in an Act 111 award regarding whether a provision that involves a public employer's non-bargaining managerial rights, a court must first determine if what is at issue is a management right, and then determine whether the award unduly infringes upon that right. When an award unduly infringes upon the exercise of managerial responsibilities, it concerns a managerial prerogative that lies beyond the scope of collective bargaining and reflects an excess of the panel's Act 111 powers and is voidable. *City of Philadelphia*, 999 A.2d at 563 (footnotes omitted).[16]

---

**(continued…)**

was prepared and given to the proper party. The trial court suggested that if Act 205 procedures were not followed, it would warrant the changes eliminating the arbitration panel's modification of pension benefits. Because of the way we have resolved the issues regarding pensions by finding that it is illegal to allow for the purchase of pension time for time not worked and to eliminate the minimum age for retirement, we need not discuss that issue and remand is no longer necessary because, even if Act 205 was not followed, the benefits that the Union claims cannot be reduced because of non-compliance with Act 205 still could not be awarded because they would be illegal. Accordingly, that portion of the trial court's order remanding to the arbitration panel on the Act 205 issue is reversed.

[16] *See also Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 998 A.2d 589, 600 (Pa. 2010) ("[W]hen addressing topics which straddle the boundary between ostensibly mandatory subjects of bargaining and managerial prerogatives, we believe once it is determined that, as here, the topic is rationally related to the terms and conditions of employment, i.e., germane to the work environment, the proper approach is to inquire whether collective bargaining over the topic would unduly infringe upon the public employer's essential managerial responsibilities. If so, it will be considered a managerial prerogative and non-bargainable. If not, the topic is subject to mandatory collective bargaining. We find this inquiry regarding subjects of bargaining and managerial prerogatives to embrace both the rights of police and fire personnel and the unique needs of public employers.").

15

This Court has long recognized the distinction between manning requirements such as the number of firefighters that respond to a fire, which is bargainable because it implicates firefighter safety, and the size of the force – the number of firefighters to be employed – because it relates to a city's overall capacity to fight fires, a non-bargainable managerial prerogative. In *City of Scranton*, an arbitration panel issued an award mandating that the City of Scranton increase its minimum complement of fire fighters to 225 persons. The city sought to vacate the award, arguing that the size of the force is a managerial prerogative and not subject to arbitration as a condition of employment. The union argued that the number of firemen on the force was a condition of employment, directly related to the safety of its members. The trial court vacated the award, concluding that the size of the fire department was outside of the arbitrator's authority and this Court affirmed, opining in pertinent part:

> The bottom line of the instant appeal is whether the court will permit the members of fire and police forces to decide how much of the municipal budget will be spent in the areas of fire and police protection, under the guise of safety considerations. To grant this appeal, and reverse the lower court, we must give the [union] the right to have a major decision-making impact on government spending, budgeting, the level of police and fire protection that the municipality must provide, and even taxation, because salaries for the additional employees must come from public funds. To affirm the award of the arbitrator as being within the scope of arbitrable issues, the court must effectively put [union members] on an equal footing with their employer on a major policy-making question. These people are, after all, employees, not employers.

> The courts that have dealt with this issue have drawn a *very* fine line in distinguishing between the total

16

number of persons on the force (not arbitrable), and the number of persons on duty at a station, or assigned to a piece of equipment, or to be deployed to a fire (all arbitrable because they are rationally related to the safety of the firefighters). However, this Court finds merit in that distinction, because the result still leaves in the municipality the ultimate decision concerning what level of fire protection it wishes, or can afford, to provide to the citizens. If it finds that the arbitrable situations cause an imbalance in certain areas of the force, it retains the authority to decide whether to hire more employees, close stations, revamp the force, or take some other managerial action. Since the method of resolving the imbalance may have far-reaching political and economic implications, especially if taxes must be raised, it should remain within the purview of those who were elected and/or appointed to make such decisions.

429 A.2d at 781 (emphasis in original). We concluded in *City of Scranton* that Act 111 does not remove from the employer's managerial authority the total number of firemen on a force. *Id.*

Likewise, in *Appeal of City of Erie*, 459 A.2d 1320 (Pa. Cmwlth. 1983), *appeal dismissed*, 481 A.2d 610 (Pa. 1984), an arbitration panel issued an award mandating a minimum crew of four on each firefighting rig in the City of Erie, finding that the number of firefighters per rig was a matter of safety, a working condition and, therefore, a proper subject for arbitration. Citing the testimony of the union's expert that manning an engine or ladder company with less than four men could impair the firefighters' safety, we distinguished *City of Scranton*, explaining that "[t]he safety of a firefighter is far more rationally related to the number of individuals fighting a fire with him, or *operating an important*

17

*piece of equipment* at a fire, than it is to the number of members of the entire force." *City of Erie*, 459 A.2d at 1321 (emphasis in original and citation omitted).

Additionally, in *Schuylkill Haven Borough v. Schuylkill Haven Police Officers Association*, 914 A.2d 936 (Pa. Cmwlth. 2006), an arbitration panel issued an award mandating, *inter alia*, that no currently employed full-time police officer may be laid off during the CBA's term. The borough sought to vacate that portion of the award arguing that it was in derogation of it management rights. The trial court vacated that portion of the award and this Court affirmed, explaining that "[w]here a managerial policy concern substantially outweighs any impact the issue will have on employees, the subject will be deemed a managerial prerogative and non-bargainable." 914 A.2d at 941 (citations omitted). We noted that "[o]ne area that has been consistently recognized as an inherent management prerogative is the total number of police officers or firemen that a municipality desires to employ." *Id.* (citations omitted). Quoting *City of Scranton*, we determined, "[b]ecause the number of police officers that Employer desired to employ was a management prerogative and not subject to bargaining, the trial court properly vacated [that provision] as the [Arbitrators] exceeded [their] authority by providing that any current employee may not be laid off for the term of the award." *Id.*

Because the minimum shift manning requirements of the award concerns both the terms and conditions of employment of the City's firefighters and the City's managerial responsibilities, we must determine whether it unduly burdens the latter. *City of Philadelphia*, 999 A.2d at 571-72; *Borough of Ellwood City*, 998 A.2d at 600. As outlined above, the level of staffing of a fire department

18

has been recognized as within a public employer's managerial prerogative because such "impact[s] on government spending, budgeting, the level of … fire protection that the municipality must provide, and even taxation, because salaries for the additional employees must come from public funds." *City of Scranton*, 429 A.2d at 781. By requiring the City to employ a minimum number of firefighters per shift, the award unduly infringes directly upon its managerial prerogative by restricting "the ultimate decision concerning what level of fire protection [the City] wishes, or can afford, to provide to [its] citizens." *City of Scranton*, 429 A.2d at 781. Such a requirement is not as directly related to the firefighters' performance of their duties and, therefore, properly the subject of collective bargaining, as that present in *City of Erie*.

As a result, minimum manning "concerns a managerial prerogative that lies beyond the scope of collective bargaining, reflects an excess of the board's Act 111 powers, and is voidable." *City of Philadelphia*, 999 A.2d at 563 (footnotes omitted). *See also Schuylkill Haven Borough*, 914 A.2d at 941. Accordingly, that portion of the trial court's order denying the City's petition to vacate the shift manning provisions contained in Paragraph 3 of the award is reversed.

**B.**

The next question is whether the panel could eliminate a firefighter's ability to buy up to four years of time for the calculation of pension benefits[17] and

---

[17] As this Court has explained, "[i]n Pennsylvania, the nature of retirement provisions for public employees is that of deferred compensation for services actually rendered in the past, thus **(Footnote continued on next page…)**

the ability to retire at any age because it represents a reduction in an employee's rights or privileges in his or her pension or retirement system.

This presents an issue because the City has adopted a home rule charter form of government. Article 9, Section 2 of the Pennsylvania Constitution states, in relevant part, that "[a] municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." Pa. Const. art. 9, section 2. "In general, the adoption of a home rule charter acts to remove a municipality from the operation of the code provisions enumerating the powers of that particular class of municipality. Thus, in the absence of explicit constraint or collateral effect on another municipality, there will be no conflict between the home rule municipality's actions and the former code provisions, since the latter no longer apply." *Wecht v. Roddey*, 815 A.2d 1146, 1152 (Pa. Cmwlth. 2002), *appeal denied*, 827 A.2d 432 (Pa. 2003) (citation omitted).

However, there are limitations on a municipality's exercise of that broad grant of power. Section 2962(c) of the Home Rule Charter Law prohibits a municipality from "diminish[ing] the rights or privileges of any former municipal employee entitled to benefits or any present municipal employee in his pension or

---

**(continued…)**

reflecting contractual rights. Our Supreme Court [has] defined 'pension' as a bounty for past services, designed to provide the recipient with his daily wants." *Tinicum Township v. Fife*, 505 A.2d 1116, 1119 (Pa. Cmwlth. 1986), *appeal denied*, 544 A.2d 1343, 1344 (Pa. 1988) (citation omitted).

retirement system," but it also forbids "[e]nact[ing] any provision inconsistent with any statute heretofore enacted prior to April 13, 1972, affecting the rights, benefits or working conditions of any employee of a political subdivision of this Commonwealth." 53 Pa. C.S. §2962(c)(3), (5). *See also* Section 2962(e), 53 Pa. C.S. §2962(e) ("Statutes that are uniform and applicable in every part of this Commonwealth shall remain in effect and shall not be changed or modified by this subpart. Statutes shall supersede any municipal ordinance or resolution on the same subject.").

In this case, Section 4321 of the Third Class City Code, which governed the City prior to its adoption of home rule and was undisputedly enacted prior to April 13, 1972, provides, in relevant part, that an ordinance establishing or regulations governing the Department's pension fund "shall prescribe" a minimum of "not less than twenty years" of "continuous service," and when "any minimum age is prescribed, a minimum age of fifty years." 53 P.S. §39321(a). The question is whether an illegal benefit can be removed even though it adversely affects an employee's pension.

That question was answered in *Municipality of Monroeville v. Monroeville Police Department Wage Policy Committee*, 767 A.2d 596 (Pa. Cmwlth. 2001). In that case, the Municipality of Monroeville, a home rule municipality, and the Wage Policy Committee for its Police Department, were parties to a CBA which provided a pension benefit of 65 percent of the "average monthly salary" which is in excess of the pension benefit allowable under the

21

statute known as Act 600.[18]  The CBA also provided that the average monthly salary was to be based on the highest 36 months of employment which also violated Act 600 requiring that the average monthly salary be based on the last 36 to 60 months of employment.  After the CBA expired, the municipality would not agree to include these provisions in the new contract because they violated Act 600.

The dispute was submitted to a board of arbitration under Act 111 whose award, in addition to raising wages, provided that "[a]ll terms and conditions of employment encompassed by the prior [CBA] or in effect during its term, and that are not altered by this Award, shall remain in full force and effect…." *Municipality of Monroeville*, 767 A.2d at 597.  The trial court granted the municipality's petition for a rule to show cause why the award should not be declared illegal "on the basis that courts will not impose an illegal provision on anyone, including municipalities," and the court "held that while the old contract was enforceable against the municipality because it was voluntarily agreed to, the parties did not agree to a new contract with those terms because the municipality became aware of the illegality … and would not voluntarily agree to reinsert those provisions in the new contract." *Id.* at 597-98.

---

[18] Act of May 29, 1956, P.L. (1955) 1804, *as amended*, 53 P.S. §§767-778.  Specifically, Section 5 of Act 600 provides that "[m]onthly pension or retirement benefits other than length of service increments shall be computed at one-half the monthly average salary of such member during not more than the last sixty nor less than the last thirty-six months of employment."  53 P.S. §771(c).

22

In rejecting the Wage Policy Committee's claim that a municipality governed by the Home Rule Charter Law may provide pension benefits to its police officers in excess of those authorized by law, in that case, limited by Act 600, we stated:

> [T]he Police argue that a police pension fund in a home rule charter municipality is not subject to Act 600. We disagree.
>
> Section 2962(c)(5) of the [Home Rule Charter Law] provides that a home rule municipality may not "[e]nact any provision inconsistent with any statute heretofore enacted prior to April 13, 1972, affecting the rights, benefits, or working conditions of any employe of a political subdivision of this Commonwealth." 53 Pa. C.S. §2962(c)(5). Although Section 2961 of the [Home Rule Charter Law], 53 Pa. C.S. §2961, bestows upon a home rule municipality broad municipal powers, Section 2962(c)(5) clearly precludes home rule municipalities from providing pension benefits different from those prescribed in general law including Act 600 which was enacted in 1956.
>
> The Police argue that Section 2962(c)(5) only prohibits the enactment of provisions that adversely affect the rights, benefits or working conditions of employees. The Police contend that Section 2962(c)(5) does not prohibit ordinances, which improve the rights, benefits or working conditions of employees. Based on the plain language of Section 2962(c)(5), we disagree. Section 2962(c)(5) simply does not contain any language limiting the prohibition found therein to statutes or ordinances which adversely affect the rights, benefits or working conditions of employees. Accordingly, we refuse to insert such a limitation.

*Id.* at 599 (citation and footnote omitted). *See also Norristown Fraternal Order of Police, Lodge 31 v. DeAngelis*, 611 A.2d 322 (Pa. Cmwlth. 1993) ("By enactment of [the prior version of Section 2962(c)(5) of the Home Rule Charter Law], the legislature established an area in which its statutes would continue to control in all municipalities in the Commonwealth. Thus, through passage of the [Home Rule Charter Law], the legislature did not intend to jeopardize existing statutory protections regulating police officer appointments [under the former Sections 1171 to 1195 of the Borough Code.[19]]"); *Fire Fighters, Local Union, No. 1 v. Civil Service Commission of City of Pittsburgh*, 545 A.2d 487, 490 (Pa. Cmwlth. 1988), *aff'd*, 571 A.2d 377 (Pa. 1990) ("[T]he home-rule constraint [in the prior version of Section 2962(c)(5)] does not merely say that a [home rule] city cannot alter or diminish previous positions which presented promotion opportunity. It bars 'any provision inconsistent' with a prior statute 'affecting rights.' The 1963 statute [establishing civil service positions for fire fighters in second class cities[20]] is a prior statute, it unarguably affects the rights of employees, and it plainly says that *all* positions in the bureau 'shall be' competitive, other than fire chief and chief clerk. Obviously, *to create further exempt positions is inconsistent with that stated limit on exemptions*.") (emphasis in original).

As indicated, the provisions of the City's Administrative Code and the prior CBA allowing the purchase of four years of service and the ability to retire at

---

[19] Act of February 1, 1966, P.L. (1965) 1656, *as amended*, 53 P.S. §§46171-46195, repealed by Act of April 18, 2014, P.L. 432. *See now* Sections 1170 to 1194 of the Borough Code, 8 Pa. C.S. §§1170-1194.

[20] Act of June 27, 1939, P.L. 1207, *as amended*, 53 P.S. §23491.

any age were not in accord with the Third Class City Code which requires a firefighter to have 20 years of continuous service to retire and reach the age of 50 to retire with a full pension. Because those provisions were illegal,[21] the arbitration panel's award eliminating those benefits did not constitute a "diminishment" of a current employee's rights or privileges in his or her pension or retirement system within the meaning of Section 2962(c)(3) of the Home Rule Charter Law because, like in *Municipality of Monroeville*, it was illegal for those benefits to be awarded in the first place. *See id. See also City of Wilkes-Barre v. City of Wilkes-Barre Police Benevolent Association*, 814 A.2d 285, 288 (Pa. Cmwlth. 2002), *appeal denied*, 823 A.2d 146 (Pa. 2003) ("The Constitution of Pennsylvania and the [Home Rule Charter Law] prohibit a home rule municipality, such as City, from unilaterally diminishing rights of any former or present municipal employee in his retirement system. There is no corresponding limitation on consensual modification of existing retirement benefits, nor is there authority limiting arbitrators' ability to modify retirement benefits as part of a statutory dispute resolution process. Nevertheless, here the arbitrators did not require an illegal act by confining limitation on excessive retirement benefits to future, but not current, police officers.").[22]

---

[21] "[A] board of arbitrators exceeds its power when an award requires a municipality to take an action that is prohibited by statutory law." *Municipality of Monroeville*, 767 A.2d at 600 (citation omitted).

[22] *But cf. Fraternal Order of Police, Flood City Lodge No. 86 v. City of Johnstown*, 39 A.3d 1010, 1011 (Pa. Cmwlth.), *appeal denied*, 57 A.3d 72 (Pa. 2012) ("Clearly, [in *Appeal of Upper Providence Township*, 526 A.2d 315 (Pa. 1987),] the Supreme Court did not distinguish between present and former employees. This approach is logical: the prospective elimination of the post-retirement healthcare benefits most immediately affected former employees, but it would also affect current employees when they retired in the future. As to both groups, the **(Footnote continued on next page…)**

However, a different result occurs regarding firefighters who had already retired under the CBA. As this Court has explained:

> In [*Fraternal Order of Police, E.B. Jermyn Lodge #2 by Tolan v. Hickey*, 452 A.2d 1005 (Pa. 1982)], the Supreme Court held that, once accepted, an employer cannot avoid a term in a [CBA] that it agreed to under the guise of illegality. *Hickey*, [] 452 A.2d at 1008. However, the Supreme Court in *Hickey* distinguished between situations where an arbitration panel attempts to mandate a governing body over its objection to carry out an illegal act and situations where the governmental unit employer attempts to belatedly avoid compliance with a term of a [CBA] it voluntarily agreed to during the bargaining process and thereby secure an unfair advantage in the bargaining process. *Id.*
>
> In *Lee v. Municipality of Bethel Park*, 722 A.2d 1165 (Pa. Cmwlth. 1999), this Court pointed out that it had previously in *Borough of Dormont v. Dormont Borough Police Department*, 654 A.2d 69 (Pa. Cmwlth.[), *appeal denied*, 661 A.2d 875 (Pa. 1995)], specifically declined to extend *Hickey* and the cases following it to cases involving an interest arbitration award. In *Dormont*, this Court recognized the current state of the law, as set forth in *Hickey*, that illegality cannot be asserted when an element of a [CBA] is consented to by both parties. *Dormont*, 654 A.2d at 71. However, we declined to extend *Hickey* to cases where an issue is resolved in a decision by arbitrators and not by a [CBA].

---

**(continued…)**

diminishment of post-retirement healthcare benefits was expressly declared illegal under the Home Rule Charter Law. This decision appears binding and dispositive.").

*Municipality of Monroeville*, 767 A.2d at 600. *See also* Section 2962(c)(3) of the Home Rule Charter Law, 53 Pa. C.S. §2962(c)(3); *Appeal of Upper Providence Township*, 526 A.2d at 322 ("Since the Township was prohibited by the [prior version of the Home Rule Charter Law] from voluntarily eliminating the post-retirement hospital and medical benefits for present and former employees, the award of the arbitrators eliminating those benefits for 1984 was illegal and thus in excess of the exercise of their powers. While we disapprove of their reasoning, the lower courts were correct, therefore, in reversing the arbitration award to the extent that it eliminated post-retirement hospital and medical benefits for 1984.").

Based on the foregoing, the City cannot now avoid the application of the purchase of time provisions of the CBA with respect to retirees, but it properly contested its inclusion in the new CBA and its application to current employees in its appeal of the panel's award issued in the instant interest arbitration proceedings. Accordingly, the trial court properly granted the Union's petition to vacate Paragraph 6(c) as to former employees and properly denied the Union's motion to vacate Paragraph 6(c) as to current Department employees.

However, the trial court abused its discretion in extending these benefits beyond the effective date of the award based on equitable concerns in "an effort to strike a balance between the parties' respective interests," (RR at 897a), because such is patently beyond the narrow certiorari scope of review. *See, e.g., City of Scranton v. E. B. Jermyn Lodge No. 2 of Fraternal Order of Police*, 903 A.2d 129, 135 (Pa. Cmwlth. 2006), *appeal denied*, 919 A.2d 959 (Pa. 2007) ("As our Supreme Court has instructed, what is in excess of the arbitrator's powers

27

under th[e narrow certiorari] test is not whether the decision is unwise, manifestly unreasonable, burdens the taxpayer, is against public policy or is an error of law; an arbitrator only exceeds his power if he mandates that an illegal act be carried out or requires a public employer to do that which the employer could not do voluntarily.") (citations omitted).  Accordingly, that portion of the trial court's order relating to the Union's petition to vacate Section 6(c) of the panel's award is affirmed, but we reverse that portion of the trial court's order delaying the effective date of the elimination of the Article 30 benefits.

## C.

Finally, we affirm the trial court's denial of the Union's petition to vacate that portion of the award which eliminated the COLA as provided in Article 29 of the former CBA.  The trial court properly cited *York Paid Fireman's Pension Fund Board of York City v. Lindsay*, 415 A.2d 441, 443 (Pa. Cmwlth. 1980), *appeal dismissed*, 430 A.2d 1151 (Pa. 1981), for the proposition that "the receipt of increased benefits in one year [does not create] a vested right in future increases in subsequent years" and "the [COLA] is not a vested right *ad infinitium* into the future" so that it was only a vested right for those retiring between January 1, 2005, and December 31, 2011, while Article 29 was active and it was only an expectation and not a vested right as to those retiring after December 31, 2011.  Nevertheless, we likewise conclude that the trial court abused its discretion in extending the elimination of the COLA in Article 29 beyond the effective date of the award because such exceeds its limited narrow certiorari scope of review.  *See City of Scranton*, *ante*.

28

Accordingly, for the foregoing reasons, the trial court's order is affirmed in part and reversed in part as set forth in the foregoing opinion.


_____
DAN PELLEGRINI, President Judge


Judge Simpson concurs in the result only.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| City of Allentown, | : | |
| | : | |
| v. | : No. 1802 C.D. 2014 |
| | : | |
| International Association of | : | |
| Fire Fighters Local 302 | : | |
| | | |
| International Association of | : | |
| Fire Fighters Local 302 | : | |
| | : | |
| v. | : | |
| | : | |
| City of Allentown, | : | |
| Appellant | : | |

# **O R D E R**

AND NOW, this 7ᵗʰ day of August, 2015, those portions of the order of the Lehigh County Court of Common Pleas dated September 8, 2014, denying the City of Allentown's petition to vacate Paragraph 3 of the November 6, 2013 arbitration award regarding the minimum staffing requirements of Article 26(B) of the parties' collective bargaining agreement and remanding the matter to the arbitration panel for further consideration of whether the City complied with the Municipal Pension Plan Funding Standard and Recovery Act are reversed; those portions of the court's order delaying the effective date of the elimination of Article 29 and Article 30 benefits are also reversed; the court's order is affirmed in all other respects.

Jurisdiction is relinquished.

_____
DAN PELLEGRINI, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Allentown                        :
                                         :
            v.                           :    No. 1802 C.D. 2014
                                         :    Argued:  May 6, 2015
International Association                 :
of Fire Fighters Local 302               :
                                         :
International Association                 :
of Fire Fighters Local 302               :
                                         :
            v.                           :
                                         :
City of Allentown,                       :
                        Appellant        :


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE ROBERT SIMPSON, Judge
          HONORABLE MARY HANNAH LEAVITT, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge


DISSENTING OPINION
BY JUDGE BROBSON                          FILED:  August 7, 2015


An arbitration award that touches on a managerial prerogative can only be set aside where it "unduly infringes" upon that managerial right. *City of Phila. v. Int'l Ass'n of Firefighters, Local 22*, 999 A.2d 555, 571 (Pa. 2010). The majority finds that enforcement of the minimum shift manning provision in paragraph 3 of the award will unduly restrict the managerial rights of the City of Allentown (City). Although I can agree that the minimum shift manning provision touches on a managerial prerogative of the City, I find no record evidence to

support the conclusion that it unduly infringes on the same. Without record evidence of the *impact* that implementation of the minimum shift manning provision of the award will have on the City's ability to determine the level of fire protection it wishes or can afford, I cannot conclude that the arbitration panel erred under the narrow certiorari scope of review. I, therefore, respectfully dissent from Part III.A. of the majority opinion.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| City of Allentown | : | |
| | : | |
| v. | : | No. 1802 C.D. 2014 |
| | : | |
| International Association of | : | Argued: May 6, 2015 |
| Fire Fighters Local 302 | : | |
| | : | |
| International Association of | : | |
| Fire Fighters Local 302 | : | |
| | : | |
| v. | : | |
| | : | |
| City of Allentown, | : | |
| Appellant | : | |


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE ROBERT SIMPSON, Judge
          HONORABLE MARY HANNAH LEAVITT, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge


DISSENTING OPINION
BY JUDGE McCULLOUGH                          FILED: August 7, 2015


I respectfully dissent from that part of the Majority's opinion that reverses the trial court's denial of the City of Allentown's petition to vacate the minimum shift staffing requirements of the collective bargaining agreement. The testimony before the trial court clearly establishes that this requirement relates to firefighter safety and, therefore, it is subject to collective bargaining and not a derogation of management prerogative. *See City of Erie v. International*

*Association of Firefighters, Local 293*, 459 A.2d 1321, 1321 (Pa. Cmwlth. 1983). Hence, the minimum shift staffing requirement is distinguishable from the cases cited by the Majority which hold that the *total number* of firefighters that a municipality desires to employ is an inherent managerial prerogative.

_____
PATRICIA A. McCULLOUGH, Judge